Henry D. MAYER and Marianne
Mayer, Plaintiffs,

v.

DEVELOPMENT CORP. OF AMERICA,
Alvin Sherman, Morris R. Sherman, Pe-
dro Diaz, Irving Fishman, Edward
Lempka and Berta Dee Stern, Defend-
ants.

Civ. A. No. 78–929.

United States District Court,
D. New Jersey.

April 22, 1981.

German, Gallagher & Murtagh by Edward C. German and John C. McNamara, Jr., Philadelphia, Pa., for plaintiffs.

Robinson, Wayne & Greenberg by Thomas D. Ruane, Newark, N. J., for defendants.

### OPINION *

MEANOR, District Judge.

*Background and Procedural History*

On May 3, 1978, the complaint in this diversity action was filed by Henry and Marianne Mayer, citizens of New Jersey. Defendant Development Corporation of America (hereinafter referred to as "DCA") is a Florida corporation with its principal place of business in Hollywood, Florida. Defendant Alvin Sherman is a citizen of Florida and was, at all relevant times, the chief executive officer of DCA. Defendant Morris Sherman is a citizen of New York and was, at all pertinent times, counsel to DCA.[1] The remaining individual defendants, Pedro Diaz, Irving Fishman, Edward Lempka and Berta Dee Stern, were alleged to have been members of DCA's board of directors at all times pertinent hereto.[2]

Up to and during 1969, Henry and Marianne Mayer, along with others, owned all of the outstanding stock in three New Jersey corporations, namely, the Mayer Construction Co., Barnegat Light Development Co. and Coast Realty Co. Henry Mayer was the major stockholder in each of these companies and was president of Mayer Construction Co. from 1960 to 1969. On September 5, 1969, an "Agreement and Plan of Reorganization" (hereinafter referred to as "Agreement"), Exhibit D–2, was entered into by the parties. Pursuant to the Agreement, DCA was to acquire all the outstanding stock of the Mayer Corporation—an entity into which the three above mentioned corporations had been consolidated. The Agreement was the culmination of a series of negotiations which had their inception in the spring of 1969. The Agreement is also the focal point of the instant controversy.

In their complaint, plaintiffs allege that actions taken by the defendants in connection with DCA's claim for certain tax deductions constitute a breach of contract and various torts. The individual liability of defendants Alvin Sherman and Morris Sherman is predicated upon theories of tortious interference with the contractual relations between plaintiffs and DCA and the intentional infliction of emotional distress upon the plaintiffs. For relief, plaintiffs seek a declaratory judgment to that effect and that

> all Defendants are required, jointly and severally, to indemnify Plaintiffs for any and all damages which may be incurred by them as a result of Defendants' wrongful conduct, including but not limited to all taxes, interests and penalties which may be found due and owing by Plaintiffs to the IRS as a result thereof, together with any and all expenses, costs and legal fees incurred by Plaintiffs in connection with the efforts of the IRS to collect the alleged deficiencies.

Complaint at 15 to 16, para. (a)(iv). In addition, plaintiffs seek compensatory damages from DCA for the willful and deliberate breach of contract and compensatory damages from Messrs. Sherman and Sherman for their alleged tortious conduct and infliction of emotional distress. Lastly, they seek the imposition of punitive damages on all counts.

---

* Throughout this opinion, deposition testimony will be referred to by the surname of the deponent followed by page and line designation, where necessary, of the transcript on which the particular testimony may be found. Trial testimony will be identified by the abbreviation "Tr." and followed by the page and line designation, where necessary, of the daily trial transcript on which such testimony may be found. Citation to the court's earlier opinion, addressing the summary judgment motions, is indicated by the use of "Slip Op. at   ."

1. I should note that Messrs. Alvin Sherman and Morris Sherman are not related. Tr. 132. Furthermore, although the above text refers to Morris Sherman as counsel to DCA, he was not employed on a retainer basis. He performed services for DCA on a case-by-case basis. Tr. 310 to 311.

2. These defendants were dismissed with prejudice as parties to this action by Order dated November 6, 1980.

The defendants have denied all allegations of wrongdoing and assert that their actions constitute neither a breach of contract nor tortious activity.

After substantial discovery was had, the defendants moved for summary judgment on a variety of grounds. In an unpublished opinion, filed April 30, 1980, I granted in part and denied in part defendants' motion. *Mayer v. Development Corp. of America,* Slip Op. (D.N.J., Apr. 30, 1980) (hereinafter cited as "Slip Op.").

The matter then came on for trial, without a jury, on October 31, 1980. After four days of testimony, I reserved decision and requested the parties to submit their proposed findings of fact and conclusions of law with supporting memoranda shortly thereafter.[3] The opinion which follows constitutes this court's findings and conclusions pursuant to Fed.R.Civ.P. 52(a).

## I. Findings of Fact

### A. The 1969 Agreement.

As mentioned above, on September 5, 1969, an "Agreement and Plan of Reorganization" was entered into between the parties. Pursuant to the Agreement, DCA acquired all the outstanding stock of the Mayer Corporation. The Agreement was the culmination of a series of negotiations which had their inception in the spring of 1969. At that time, Henry Mayer had placed advertisements in the Wall Street Journal soliciting potential purchasers of the Mayers' corporations. DCA's reply was one of the approximately twelve responses received by Mayer in which Mayer expressed an interest. Tr. 183.

As a result of Mayer's response to the DCA inquiry, Mayer met with various DCA personnel, including DCA's head of acquisitions, George Samuels, and its president and then largest stockholder, Alvin Sherman, in April and June of 1969 in Hollywood, Florida. Tr. 114, 162, 183. At one of these meetings, Alvin Sherman proposed a formula by which DCA would acquire the Mayers' corporations in a non-cash stock exchange. Tr. 184. Since the proposed acquisition would be cash-free, however, Mayer insisted that the exchange would have to be tax-free. Tr. 185. Mayer testified that "since there was no cash involved . . . [he] couldn't very well come up with money to pay the taxes when . . . [he] was in essence getting a piece of paper." Tr. 186–6 to –8. Accordingly, a determination was made to structure any acquisition as a "tax-free exchange."[4] In a letter dated June 25, 1969, Henry Mayer also expressed his desire to be placed on the board of directors of DCA. D–1, para. XI, at 4.

In late July 1969, Mayer received from DCA a proposed draft of an acquisition agreement (hereinafter referred to as "Initial Draft"). DB–1. The Initial Draft was prepared by Morris Sherman. Tr. 313–18. It contemplated the acquisition of all the outstanding stock of the three Mayer corporations through the issuance and delivery of shares of DCA common stock to the shareholders of those companies in a tax-free reorganization pursuant to section 368(a)(1)(B) of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 368(a)(1)(B).[5] In

**3.** Although there appears to be some dispute as to those portions of the Mayer deposition that have been moved into evidence, the court cannot grant defendants' request that it only consider those portions of the transcript cited in Exhibit DT–6. At the conclusion of the trial, I *directed plaintiffs to provide the court with a* highlighted copy of Mayer's deposition. Defendants agreed to this procedure. Tr. 489. The plaintiffs have supplied the court, albeit somewhat tardily, with such a copy and I will consider those highlighted portions when necessary.

**4.** A "tax-free exchange" refers to § 354(a)(1) of the Internal Revenue Code, 26 U.S.C.

§ 354(a)(1), which, in pertinent part, provides: "[n]o gain or loss shall be recognized . . ." in connection with the exchange of stock in certain types of reorganizations. *See Vorbleski v. Commissioner,* 589 F.2d 123 (3d Cir. 1978).

**5.** Section 368(a)(1)(B) of the I. R. C. provides:

(1) *In general.*—For purposes of parts I and II and this part, the term "reorganization" means—

. . . .

(B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is

fact, the Initial Draft stated such explicitly: "it being intended by the parties hereto that such exchange be a tax-free reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended, . . . ." DB–1, at 2.

The original structure of the transaction, as set forth in the Initial Draft, provided for the delivery of DCA stock to the Mayers in two "installments." DB–1, Art. V, at 10. The first "installment," termed the "Initial Shares," was to be determined on the basis of a formula geared to the September 30, 1969, financial condition of the three Mayer companies. These shares were deliverable at the closing of the agreement. The second "installment," termed the "Additional Shares," would be determined on the basis of another formula geared to the earnings performance of the Mayer corporations during the three-year period ending December 31, 1972.

Upon receipt of the Initial Draft, Henry Mayer had it reviewed by his accountant, Frank J. Ewart. Ewart then suggested that the agreement be reviewed by David Beck, Esq., an attorney considered by Ewart to be experienced in this field. Mayer complied with this suggestion and a copy of the Initial Draft was forwarded to Beck for his review. Tr. 13. Beck's primary concern was to determine whether the Initial Draft would qualify the transaction as a tax-free reorganization. *Id.* However, Beck also undertook a general review of the entire agreement. *Id.*, 17. At some point during his review, the question of possible

"imputed interest" [6] arising out of the transaction occurred to Beck. Beck testified that the structure of the exchange of the "Additional Shares" contingent upon the subsequent earning capacity of the acquired corporation presented this problem. As a result of some additional research, Beck believed that the Initial Draft

> violated [the] imputed interest rule which meant that on the exchange which we wanted to be tax free, the Internal Revenue Service by its own guidelines would read into this contract consequences whereby the shareholders would be taxed to the extent of ordinary income based on a formula being read in that they would have had interest imputed to them even though not stated in the agreement. . . . [I]t's imputed to the stockholders, and by the same token the acquiring corporation would have had an offsetting deduction for income tax purposes.

Tr. 18–22 to 19–7.

The court is persuaded that Henry Mayer, once appraised by Beck of the tax implications of the proposed agreement, as set forth in the Initial Draft, sought to avoid these implications at all costs. In both their deposition and trial testimony, Messrs. Mayer, Tr. 191 to 197, 261 to 263, Mayer 50, and Beck, Tr. 28 to 33, 46 to 47, Beck 18 to 19, 21 to 24, 35 to 36, 39, 43, 44 to 45, stated that they consistently and unwaivingly expressed to DCA's representatives their paramount desire to avoid the imputation of interest income to the Mayers as a result of

---

in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);

26 U.S.C. § 368(a)(1)(B). A "B reorg" involves the acquisition of one corporation by another. The acquiring corporation exchanges its stock *solely* for stock held by the shareholders of the acquiring corporation. After the exchange the shareholders of the acquired corporation hold the stock of the acquiring corporation, but retain the basis and holding period of the stock of the acquired corporation surrendered by them in the exchange. Thus, despite their "exchange" of stock, the shareholders of the ac-

quired corporation in a "B reorg" do not incur capital gain with respect to the transaction. In other words, the reorganization is "tax-free" as to them at that juncture. *See Vorbleski v. Commissioner,* 589 F.2d at 132.

**6.** Section 483 of the I. R. C. treats as interest income a specified part of "any payment on account of the sale or exchange of property which constitutes part or all of the sales price and which is due more than 6 months after the date of such sale or exchange. . . ." 26 U.S.C. § 483(c)(1). It is now thought that the imputation of interest under § 483 may be inconsistent with a finding that a reorganization is tax-free. *Vorbleski v. Commissioner, supra*; Tr. 37 to 38, 49 to 51.

this transaction. Morris Sherman's testimony corroborates this point. Tr. 322 to 359. Mayer's insistence was so definite that Beck testified that "there would have been no deal had we not changed it around." Tr. 30–4; see Tr. 192. Accordingly, negotiations commenced between the parties in an attempt to produce a satisfactory agreement.

Beck suggested to Morris Sherman that language be inserted for the purpose of avoiding imputed interest income to Mayer and precluding a deduction for imputed interest by DCA. Beck relied heavily upon Example 8 of the Regulations under section 483 and a tax article written by David R. Tillinghast entitled "Contingent Stock Payouts in Tax-Free Reorganizations," appearing in 22 Tax Lawyer 467 (1969). DB–3. Morris Sherman does not deny that this material was shown to him during the course of the negotiations. Tr. 323 to 326. It was Beck's position that to avoid the concept of an installment payment and the imputation of interest income, Tr. 24, the final agreement must provide for the immediate delivery of all DCA shares receivable by the Mayers, coupled with an escrow as to any "earn out" shares. Tr. 323. Beck also indicated that it would be necessary to change the term "installment" in the Initial Draft to "categories." Tr. 28.

Morris Sherman, DCA's attorney and principal negotiator in this matter, acknowledged that he originally gave no consideration to the concept of imputed interest when he prepared the Initial Draft. Tr. 314. Beck injected the issue into the negotiations. Tr. 322, 457 to 458. Sherman admitted, however, that the avoidance of imputed interest was a "very important consideration at the time." Tr. 323–15. He indicated that DCA had no objection in principle to Beck's proposal of the avoidance of imputed interest, but its main concern was the protection of its business interests. Tr. 357–18. Sherman also indicated that certain "business considerations" prevented DCA from taking a position "that would have been clear, simple and unequivocal," and that he did not form an opinion on the question of imputed interest until April 1974 when DCA was considering litigation against Mayer. M. Sherman 60 to 62.

The actual negotiations on this issue and the results generated therefrom are matters of some dispute. Morris Sherman testified that Beck's proposed method of avoiding the imputation of interest income to Mayer, i.e., the immediate delivery of all shares of DCA stock potentially receivable by the Mayers coupled with an escrow of divestible shares, could cause difficulty. Some of the business considerations which might have caused difficulty for DCA were alluded to by Mayer. The immediate delivery of all the shares, totaling 170,000, to the Mayers would dilute DCA's earnings per share. Tr. 192 to 193. Also, it would have provided the Mayers with approximately the same number of voting shares as Alvin Sherman. Tr. 196. Furthermore, it was also possible that DCA was unwilling to agree in September 1969 that the purchase price of the Mayer corporations was 170,000 shares of DCA stock when the Mayer corporations at that time were only worth approximately one-half of that amount. Tr. 346 to 348, 350. Thus, it is clear to the court that the prospect of preserving a future tax deduction for imputed interest expense was not a motivating factor for DCA in 1969.

On the other hand, the avoidance of imputed interest income was a matter of grave concern to the Mayers; it was a focal point in the negotiations to Henry Mayer. David Beck and Morris Sherman both testified that Beck's concern over the avoidance of imputed interest caused them to draft substantial revisions to the Initial Draft in the form of the escrow provisions found in the final agreement. Tr. 23 to 24, 26 to 28, 33 to 34, 43, 329 to 331, 344, 438 to 440, 457 to 458. Of considerable interest to the court is Mayer's testimony concerning the initial negotiations over the imputed interest problem. Mayer testified that during the negotiations he never relented on his insistence that interest income imputation be avoided. Tr. 192. When the issue finally came to a head, Messrs. Mayer and Alvin

Sherman themselves negotiated the question. Mayer explains:

> During the drafting sessions—I won't call them negotiations, although the imputed interest question was a negotiating item, but the rest was draftsmanship, I spoke—George Samuels got Al Sherman on the phone and we discussed—Al's position was the only way that we can get around the imputed interest was the delivery of all of the shares initially. And Alvin's reaction to that was negative because it would dilute the earnings per share of the parent companies.
>
> . . . .
>
> And I told him that if that was the only way that the deal was structured and if he was unwilling to go along with that there was no point in continuing the drafting sessions because they were expensive and we were not going to arrive at any conclusion.
>
> So he wanted some time to discuss it with his associates in Florida, and he called back an hour later to George Samuels and said, go ahead, and structure it with all the shares to be issued initially.

Tr. 193–6 to 194–7.

Furthermore, David Beck credibly testified that he believed he had reached an understanding and agreement with Morris Sherman, on behalf of DCA, that imputed interest would not apply to this transaction. Tr. 34, 45, 47. Beck explained that everything possible had been done by the parties to avoid the application of imputed interest in the agreement. Consequently, he did not consider it necessary to include in the agreement a declaration of intent similar to that found in section 13.10,[7] in which the parties proclaimed their desire to preserve the tax-free nature of the reorganization under section 368(a)(1)(B).[8] Tr. 35 to 36, 44, 104 to 105.

The credible testimony discussed above lends strong support to a finding by the court that the parties reached an understanding in 1969 that, regardless of any potential entitlement under the Internal Revenue Code, DCA would contractually forego its right to claim a subsequent tax deduction for any imputed interest. Of course, DCA's forebearance and loss is merely the concomitant of the Mayers' benefit, *i.e.*, the avoidance of imputed interest income and the associated taxation. This finding; however, is greatly buttressed when the court considers the other evidence before it.

A review of the executed Agreement reveals that it was structured along the lines demanded by Mayer and Beck.[9] Pursuant to section 5.1(a) of the Agreement, the Mayers were to exchange their stock in their corporation for DCA stock "to be delivered and maintained in two separate categories . . . referred to as the 'Initial Shares' and the 'Additional Shares.'" D–2, § 5.1(a), at 14. That section also provides that "D.C.A. shall deliver . . . to the Shareholders, . . . 85,000 shares of its Common Stock as the Initial Shares. . . ." *Id.* at 15 to 16. Of these 85,000 Initial Shares, 25,000 shares were escrowed for a short period

---

7. For the text of § 13.10, see page 838 *infra*.

8. Beck's additional rationale for the absence of a declaratory section with respect to imputed interest is also persuasive. He explained that the parties' intent is of greater significance and consequence under § 368, than under § 483. The former requires the parties to adopt a plan of reorganization, while the latter is more automatic in its operation. Tr. 106 to 107. In fact, the I. R. S. will impute interest income in appropriate situations despite the expressed contrary intention of the parties in their agreement. *Infra* at 838 to 840.

9. Although it is disputed by the parties whether Example 8 of the Regulations was literally complied with, *compare* Tr. 332 to 335, 344 to 345; DT–4, at 5 to 6 *with* Tr. 43 to 44, the court need not consider the issue. I do not determine here whether the Agreement, as drafted, sufficiently complied with Example 8 so as to actually achieve the tax consequences sought by the Mayers, *i.e.*, the avoidance of imputed interest. Rather, my present task is only to determine whether the parties agreed that they would attempt to achieve that result. If the parties did agree that DCA would forego any right it might have to take an imputed interest deduction, then DCA's taking of such a deduction would be a breach of contract regardless of the ultimate I. R. S. determination as to the tax ramifications of the transaction.

with Messrs. Morris Sherman and Beck to await verification of the financial performance of the Mayer companies through and including September 30, 1969. *Id.*, § 5.1(b), at 16. With respect to these escrowed shares, all dividends received were to be delivered by the registered owners into escrow. *Id.*, § 5.1(c)(i), at 16 to 17. Furthermore, the registered owners would have the right to vote the escrowed shares "as though the same had not been deposited in escrow." *Id.*, § 5.1(c)(ii), at 17.

With respect to the so-called "Additional Shares," the Agreement provided:

On the Post-Closing Delivery Date, ... D.C.A. shall deliver to the Shareholders, ... the Additional Shares due Shareholders hereunder, determined in accordance with the factors, calculations and methods set forth in Section 5.4 hereof; provided, however, that the maximum number of such Additional Shares shall in any event be limited to, and shall not exceed, the number of shares of D.C.A. Common Stock comprising the Adjusted Initial Shares....

*Id.*, § 5.2(a), at 19. In an acceleration provision, the Agreement further stated:

Notwithstanding the foregoing provisions hereof, D.C.A. shall, within 15 business days after receipt of written request from any Shareholder made at any time following the calculation and determination of the number of Adjusted Initial Shares made by Ewart under the provisions of Section 5.3 hereof, deliver to such Shareholder prior to the Post-Closing Delivery Date, as the Additional Shares due him hereunder, in certificates of such denominations as requested by such Shareholder, but subject nevertheless to the terms and conditions set forth hereinbelow, such number of shares of D.C.A.'s voting common stock as shall be equal to such Shareholder's interest in the number of Adjusted Initial Shares to which the Shareholders collectively are entitled under Section 5.3.... Upon the delivery by D.C.A. of the said Additional Shares:

(i) The Shareholder shall, concurrently with the receipt of the certifi-

cates representing such Additional Shares, deliver all of the said certificates duly endorsed in blank, ... to the Escrow Agents named in Section 5.1(b) hereof [Messrs. Beck and M. Sherman].

(ii) Said Escrow Agents shall receive ... said Additional Shares as a separate escrow fund, ... [T]he escrow period for such Additional Shares shall end on April 30, 1973, at which date the Escrow Agents shall, ... distribute and deliver said Additional Shares to and between D.C.A. and the Shareholders as their respective interests may then appear under the computations, ...

(iii) The delivery of said Additional Shares to the Escrow Agents by D.C.A. pursuant to the foregoing ... shall discharge pro tanto the obligations of D.C.A. to the requesting Shareholder....

*Id.*, § 5.2(b), at 19 to 21. Like the escrowed Initial Shares, the registered owners received the dividends and then escrowed them and enjoyed full voting rights with respect to all the shares so escrowed. *Id.*, § 5.2(b)(ii), at 20, 16 to 19.

There is no dispute that after the Agreement was executed 85,000 Initial Shares were, in fact, delivered to the Mayers at the Closing and that 25,000 of these shares were escrowed for a short period of time, until the financial performance of the Mayers' corporations through September 30, 1969, was verified. Tr. 187. With respect to the second category of shares—the Additional Shares—they were issued, registered in the Mayers' names and delivered to them in April 1970, although escrowed with Messrs. Morris Sherman and Beck. Tr. 188 to 189, 278. As the quoted provisions of the Agreement illustrate, it is clear the parties contemplated that the delivery of the Additional Shares to the escrow agents was in lieu of physical delivery of the stock certificates to the Mayers. Furthermore, stock dividends declared and paid by DCA on both the Initial Shares and the Additional Shares were sent directly to the Mayers. They then returned the certificates to Beck

and Morris Sherman for division into smaller denominations to effectuate the escrow arrangements. Tr. 189 to 190. No cash dividends were paid by DCA between 1969 and 1973. Tr. 189. Also, the Mayers voted both the Initial and Additional Shares throughout the escrow period. Tr. 190. Furthermore, during the escrow period, Morris Sherman, in a letter dated May 1, 1970, advised Beck that:

> The attorneys preparing the proxy statement for D.C.A. have advised me that Henry must prepare and file a "Form 13D" with the Securities and Exchange Commission as soon as possible. This is due to the fact that Henry became the beneficial owner of more than 10% of D.C.A.'s issued and outstanding stock with the delivery of the Additional Shares. Henry is aware of this. Will you please follow up on obtaining and filing this Form.

DT–5. Finally, in April 1973, the total amount of Additional Shares were released from escrow to the Mayers.

In addition to these facts, certain documentary evidence before the court compels a finding that the parties agreed to eliminate imputed interest from this transaction. In the early part of 1971, a minor dispute between the parties occurred concerning the number of shares that the Mayers could register for an upcoming public sale. In a letter from Beck to Mayer, dated January 13, 1971, Beck advised Mayer that the registration sales factor of ten percent should be applicable "to the total of the Initial Shares and Additional Shares received, as defined." D–13, at 3. Mayer then calculated the number of shares that his group would register and forwarded his calculations, as well as a copy of Beck's opinion letter, to Alvin Sherman. D–13.

Upon receipt of Mayer's letter of January 15, 1971, Alvin Sherman sought an opinion from Morris Sherman. Although Morris Sherman reasoned that the ten percent factor was not applicable to the Additional Shares, his letter casts light on the present controversy. He wrote:

> The original understanding of the parties to the Agreement involved a payment divided into two parts; i.e., a fixed amount of D.C.A. shares to be delivered at the Closing and the later delivery of a contingent number of D.C.A. shares to be computed on the basis of Mayer's future performance during the period ending December 31, 1972. The Mayer Shareholders did not dispute this approach but merely insisted upon avoiding a higher rate of income tax which would apply by reason of a portion of the contingent payment being deemed "unstated interest". *It was in compliance with their demand that D.C.A. agreed to the procedure* of immediately issuing the Additional Shares, subject to certain safe-guards to assure that the ultimate receipt and ownership of such shares by the Mayer Shareholders would not occur until the financial results of Mayer's operations during the period ending December 31, 1972 had finally been computed.

DB–8, at 2 (emphasis added). Clearly, these statements reflect the understanding between the parties that DCA would forego the possibility of an interest deduction. This forebearance would be the only method of complying with the Mayers' "demand."

Further support for this finding surfaces in an April 30, 1974, letter from Morris Sherman to Pedro Diaz, vice-president of DCA. DT–4. The letter contained a discussion of the availability to DCA of a deduction under section 483 for " 'unstated interest' in respect of the 192,610 shares of 'Additional Shares' which were delivered to the former Mayer Shareholders, ... under the Reorganization Agreement of September 5, 1969." DT–4, at 1. At this time, DCA was considering a claim for an interest deduction with respect to the Additional Shares. Morris Sherman wrote:

> Essentially, the determining factor as to whether a portion of these "Additional Shares" may be deemed to include "unstated interest" depends on when these Shares were "received" by the Mayer Shareholders and whether they constitute an "indefinite payment".

First, in considering the time at which they were "received", we must go back to the circumstances existing at the time of the negotiations between D.C.A. and the Mayer Shareholders and the intention of the parties involved at arriving at the Agreement which was executed on September 5, 1969. As the draftsman of the Agreement and as one of the principal negotiators involved, I clearly recollect that it was the intention of D.C.A. to pay the Mayer Shareholders a fixed number of "Initial Shares" upon the closing of the transaction and to pay them a number of "Additional Shares" early in 1973 computed and determined by reference to the operating results of The Mayer Corporation during the period October 1, 1969 through December, 1972. Said "Additional Shares" were limited in number so that, regardless of operating results, they could not exceed the number of "Initial Shares". There was no dispute between the parties on this basic point but *when Dave Beck brought to our attention the possible problem of "unstated interest" which might result from the foregoing procedure, we agreed to try to accommodate the Mayer Shareholders by issuing and delivering the maximum number of "Additional Shares" which might thereafter accrue to said Shareholders to Dave and myself, as Escrow Agents, to hold until such time as the actual number of such shares would be computed pursuant to the formula set forth in the Agreement.* It was never the intention of D.C.A. to transfer to The Mayer Shareholders the full beneficial ownership to any specific number of "Additional Shares". We agreed, in effect, merely that under certain conditions we would advance to the Escrow Agents at a date following the closing the maximum number of shares which D.C.A. might become obligated to deliver in 1973 under the formula applicable to The Mayer Corporation's operations during the period ending December 31, 1972. This was as far as we agreed to go in order to help the Mayer Shareholders solve their "unstated interest" problem; and although we ad-

mittedly made sufficient changes in the original drafts of Agreement to create some ambiguity we did not, in my opinion, go far enough to eliminate the problem.

DT–4, at 1 to 2 (emphasis added). Although this explanation contains certain inconsistencies, the existence of an "accommodation" is clearly conveyed. However, if DCA had not agreed to forego its possible interest deduction, the accommodation would be entirely illusory. It is apparent that DCA agreed to structure the transaction in such a manner so as to eliminate the blatant and obvious violations of section 483 that would spark an I. R. S. investigation, yet it sought to maintain enough flexibility in the Agreement so as to protect its non-tax business considerations. It is inconceivable then that plaintiffs would allow this accommodation to be frustrated by DCA lighting the match itself.

In addition, in its Letter Protest to the I. R. S. dated October 20, 1975, supporting its imputed interest expense deduction, DCA stated:

It should be noted that Section 5.2(a) of the Reorganization Agreement provides that "Additional Shares" were to be delivered on the "Post-Closing Delivery Date", which would have been some time in May of 1973 in accordance with the provisions of Section 8.2. Section 5.2(b) was included in the Reorganization Agreement at the request of counsel to the former Mayer shareholders for the sole purpose of creating an escrowed pool of shares—flowing from D.C.A. through the Mayer shareholders to the Escrow Agents in a simultaneous series of transactions—so that the former Mayer shareholders might be given some basis for claiming that their shares had been delivered to them prior to 1973, and thus preclude any "unstated interest" problem.

DT–3, at 63. DCA then contends that this was "ineffective" since

this did not alter the fundamental concept that the "Additional Shares" were not to be given to the former Mayer shareholders until some time in 1973 and

only to the extent determined under the formula in Section 5.4 of the Reorganization Agreement. *Id.* Even in this entirely self-serving document, there is support for the court's finding that the Agreement was structured, at the insistence of Beck and Mayer, in such a manner so as to avoid imputed interest to the Mayers. It is logically inconsistent to suppose that plaintiffs would bargain for a "basis for claiming that their shares had been delivered to them prior to 1973, and thus preclude any 'unstated interest' problem" without including in that bargain an agreement from DCA that it would not attempt to erode that basis.

Finally, certain language in the January 5, 1976, Releases, which were executed during the settlement of prior litigation between the parties, provides strong inferential support for this finding. The Releases ran to all claims except those arising out of certain tax actions taken by DCA "with respect to any tax year through and including 1974." D–20, at 3; D–26, at 3. The exempted claims were those that might arise from DCA's deductions for either "imputed interest" or any other tax treatment asserted by DCA inconsistent with the treatment "expressly or *by implication* contemplated by the parties to the . . . Agreement . . . at the time its provisions were negotiated and agreed upon." *Id.* (emphasis added). Thus, several years prior to the Mayers' institution of this litigation there is a reservation of rights against DCA with respect to causes of actions which would arise from the actions of DCA contrary to those implicitly contemplated by the parties during the negotiations. Although this reservation is merely circumstantial support for plaintiffs' position, it is language agreed upon by both parties. I do not believe that the Mayers would have bargained for a reservation founded upon non-existent agreements.

Accordingly, the court concludes, on the basis of the testimonial and documentary evidence before it, that the parties reached an understanding in 1969 that, regardless of any potential entitlement under the Internal Revenue Code, DCA would contractually forego its right to claim a subsequent tax deduction for imputed interest expense arising out of this transaction.

As previously mentioned, it is equally clear to the court that the parties intended the Agreement to be a tax-free reorganization under section 368(a)(1)(B) of the I. R. C. Mayer credibly testified that the transaction would have to be tax-free since no cash was involved. Tr. 185 to 186. Morris Sherman also testified that DCA intended the transaction to qualify under section 368(a)(1)(B) for certain business, not tax, considerations. He explained that the business considerations centered around the "pooling of interest" and the avoidance of large cash expenditures for the acquisition. Tr. 317 to 319, 321, 322. In fact, Morris Sherman stated that if the transaction did not qualify as a tax-free reorganization, the desired "pooling of interest" treatment would not be available to DCA. Tr. 322. Alvin Sherman also testified concerning DCA's interest that the transaction qualify for the benefits from the pooling of interest. Tr. 128.

This mutual intent permeates the entire Agreement—both the preliminary and final drafts. For instance, the Preamble, wherein is stated the "Intent of the Parties," reads:

WHEREAS, the Shareholders desire to transfer to D.C.A. and D.C.A. desires to acquire from the Shareholders all of the outstanding shares of the Corporations, solely in exchange for shares of voting common stock of D.C.A. which has no other class of stock outstanding, and for no cash or other property, upon the terms and conditions hereinafter set forth, it being intended by the parties hereto that such exchange be a tax-free reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954, as amended, and that upon and after such exchange D.C.A. shall be the sole record and beneficial owner of all of the issued and outstanding capital stock of the Corporations;

D–2, at 1 to 2.[10]  Furthermore, under "AR-TICLE XIII—MISCELLANEOUS PROVI-SIONS," section 13.10 states:

13.10 *Actions of the Parties After Closing*

Neither Shareholders, D.C.A. nor any of the Corporations shall hereafter know-ingly or deliberately take, maintain or defend any course of action or position which may reasonably be construed as repudiating, conflicting with or being in-consistent with the interest of the parties as expressed herein that the exchange of stock as provided for in this Agreement shall be a tax-free reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954.

D–2, § 13.10, at 49.[11]

Beck's testimony, both at trial and during depositions, is especially helpful.  During the course of his deposition testimony, Beck discussed his understanding of section 13.10.  He stated:

At the time that I participated in the preparation of this document, this provi-sion was put in to preclude anybody, shareholders, DCA, any of the corpora-tions from taking any action that would upset the intent and spirit of this Agree-ment.

Now, the intent and spirit of this Agreement ran to the tax-free nature of the reorganization, and it was understood between Morris and me that there would be no adverse tax consequences to any-body.

That included Henry Mayer.  It includ-ed Alvin Sherman.  It included anybody.

It was supposed to be a deal that was free of tax consequences that would be inconsistent with the interest of the par-ties.

Beck 38–4 to 17.  I note, however, that at trial there was some retraction from the broadness of these statements.  During cross-examination, Beck testified:

Q  So you would admit, then, that the words in Article 13.10 are not aimed at all tax ramifications, correct?

A  Yes.  I would say they didn't aim at all tax ramifications, right.

. . . .

Q  My question to you is that 13.9b of DB–1 limits itself only to tax implications which now are going to be avoided by section 368 A1B [*sic*], correct?

A  That is correct.  And for a purpose.

Tr. 76–3 to –7, 77–10 to –13.  On redirect, Beck explained what that purpose was:

Q  We have heard in your cross-exami-nation, Mr. Beck, about the several refer-ences to Section 368 that appear in the preamble and Section 13.10.  Why are there no references to Section 483 in ei-ther the preamble or 13.10 or any other section of that agreement?

. . . .

THE WITNESS:  The reason is—it's not repetitive but to some extent over-laps.  438 is an automatic section.  If you meet the requirements of what the Inter-nal Revenue Service said on how to struc-ture an escrow deal, then there's no im-puted interest.  It doesn't matter insofar as intent is concerned or not.  But on the reorganization section intent is very im-portant for the very reason, . . . that sometimes things can happen outside of the four corners of the documents that we may not know about.  So we put in a clause to the effect that intention is here.  Mr. Sherman, Morris Sherman, drafted

---

**10.**  This language in the Preamble of the final Agreement is nearly identical to that first draft-ed by Morris Sherman in the Initial Draft.  There is, however, a slight difference.  Exhibit DB–1, the Initial Draft, reads "WHEREAS, the Shareholders desire *to sell* and transfer to D. C. A.," DB–1, at 1 (emphasis added), while the final Agreement reads "WHEREAS, the Share-holders desire to transfer to D. C. A." D–2, at 1.  Beck testified that he insisted upon deleting "to sell" so as to avoid the implication that some consideration existed other than the stock ex-changed.  Tr. 70–25 to 73–8.

**11.**  There were only two changes in this clause from the Initial Draft to the final Agreement.  In the Initial Draft, this section was actually a subsection, DB–1, § 13.9(b), at 34, while in the final Agreement it is a separate section.  D–2, § 13.10, at 49.  Also, the Initial Draft stated "[n]either shareholder, . . ." DB–1, § 13.9(b), at 34.

that in his initial agreement. That wasn't my language, that was his. And I saw no reason to take it out because we all intended that there be a reorganization.

Tr. 104–2 to 105–10.

Due to the parties' expressed urgency to consummate the deal, an advance tax ruling from the I. R. S. that the Agreement constituted a tax-free reorganization was not obtained. Tr. 30 to 31. However, Beck testified that he and Morris Sherman attempted to meet the published criteria of the I. R. S. in drafting an agreement that would qualify the transaction as a tax-free reorganization. Tr. 40 to 43; DB–3, at 470. It is undisputed that the Initial Draft provided that: (1) all stock was to be issued within five (5) years; (2) there was a "valid business reason" for issuing the Initial Shares immediately and not issuing the Additional Shares until the "earn out" period had been concluded; (3) and (4) the maximum number of shares was to be stated in the Agreement in the sense that the number of Additional Shares could only be equal to, but not greater than, the number of Initial Shares; (5) the right to receive stock was expressly made non-assignable; and (6) only additional stock of DCA would be receivable by the Mayers. Tr. 41 to 44; Tillinghast, DB–3, at 470; Defendant's Proposed Findings of Fact at 18, para. 58. Furthermore, it is undisputed that the Agreement itself met the applicable criteria for qualification as a tax-free reorganization under section 368(a)(1)(B). Defendant's Proposed Findings of Fact at 18, para. 59.

On the basis of the facts discussed above, I conclude that the parties intended the transaction as structured in the Agreement to be a tax-free reorganization within the meaning of section 368(a)(1)(B). I also find that the parties sought to protect the tax integrity of the Agreement from each other's unforeseen assaults thereon by explicitly agreeing not to do so. Accordingly, any deliberate action by a party in conflict with the previously expressed interest of the parties that the transaction be a tax-free reor-

ganization within the meaning of section 368(a)(1)(B) is thus an outright breach of the Agreement.

In light of the various defenses raised in this action, other provisions in the Agreement, as well as subsequent developments between the parties, must be discussed. Section 6.2 of the Agreement provides:

6.2 None of the parties hereto shall assert any claim against any other party, arising out of or relating to this Agreement after December 31, 1973.

D–2, § 6.2, at 28. The immediately preceding section describes certain indemnification rights of DCA in the event of material inaccurate representations or breaches of warranty by the Mayers in connection with the Agreement. In its entirety, section 6.1 states:

6.1 The Shareholders agree that D.C.A. shall have the right of indemnification in respect to any loss, cost, expense, liability or damage resulting from material inaccurate representation made by the Shareholders in this Agreement, or from any material breach of any warranty made by them in this Agreement, including but not limited to the value of any asset appearing on Exhibits "B" and "C" to which the Corporations do not have good and marketable title and the amount of any lien or encumbrance existing against such assets. In the event D.C.A. shall have a right of indemnification as provided for in this paragraph, such indemnification shall first be effected by re-delivery of Initial Shares or Additional Shares previously delivered and then by set-off, against the Additional Shares of D.C.A. stock, if any, to be delivered as hereinafter described, which right shall be asserted at the figure of $15 per share, to be adjusted for stock splits, stock dividends, etc., as hereinafter provided. To the extent that D.C.A. has been unable to obtain complete indemnification by reason of Shareholders failure or refusal to re-deliver Initial Shares or Additional Shares or by reason of the insufficiency of its right of set-off against Additional Shares it shall have the right to assert a

general claim against the Shareholders at any time prior to December 31, 1973. D–2, § 6.1, at 27 to 28. I note that 6.1 and 6.2 are the only two sections in Article VI. Article VI is entitled "INDEMNITY FOR DAMAGES." D–2, Art. VI, at 27.

It is the defendants' contention that the contractual limitation set forth in section 6.2 bars this litigation, since the present suit was not commenced before December 31, 1973. In response to this argument, plaintiffs have previously contended that several factors foreclose the application of section 6.2 to the present suit. Slip Op. at 10 to 14. First, plaintiffs contend that section 13.11 of the Agreement, which provides that Florida law governs the interpretation of the contract,[12] renders void such a limitation. Second, they assert that section 6.2 relates only to section 6.1, dealing with indemnification by the Mayers for material misrepresentations, and, accordingly, its time limitation is only applicable to causes of action based on those misrepresentations. Third, the plaintiffs contend that the limitation is unenforceable, even under New Jersey law, due to its unreasonableness in that its enforcement would ignore the continuing business relationship between the parties. Fourth, the plaintiffs argue that the defendants waived the application of section 6.2 by the institution of an earlier suit in Delaware. Fifth and lastly, plaintiffs assert that the Settlement Agreement of August 1975 when considered in conjunction with the Releases delivered thereunder in January 1976 terminated the Agreement and, thus, the section 6.2 time bar, while preserving the plaintiffs' claims arising out of defendants' imputed interest deduction and alleged violation of section 13.10.

The majority of these contentions were disposed unfavorably to the plaintiffs in my earlier summary judgment opinion. In that opinion, I held that section 6.2 should be construed to limit the applicability of the choice of Florida law made in section 13.11. Slip Op. at 11 to 13. I also ruled that section 6.2 was reasonable, writing "[p]lain-

tiff will not be heard to assert that a 'cut off' of liability bargained for and sought by plaintiff is now unreasonable simply because it proves to be a 'two-edged sword.'" Slip Op. at 14. Furthermore, in that opinion I discussed the effect of the institution of the prior action, as well as the scope of the Settlement Agreement and subsequent Releases. I will discuss these occurrences in greater detail shortly. However, in my earlier opinion I did note that "[t]here is a material issue of fact as to whether § 6.2 was intended to apply to the causes of action asserted by plaintiffs in this case or, framed another way, whether § 6.2 was intended only to apply to the claims enumerated in § 6.1 of the 1969 Agreement." Id. I now address this issue.

The origin of section 6.2 is surrounded by dispute. In the Initial Draft, Article VI, entitled "INDEMNITY FOR DAMAGES," contained only one paragraph. The original Article, as drafted by Morris Sherman, read:

The Shareholder, agrees that D.C.A. shall have the right of indemnification in respect to any loss, cost, expense, liability or damage resulting from any material inaccurate representation made by the Shareholder in this Agreement, or from any material breach of any warranty made by him in this Agreement, including but not limited to the value of any asset appearing on Exhibits "B" and "C" to which the Corporations do not have good and marketable title and the amount of any lien or encumbrance existing against such assets. In the event D.C.A. shall have a right of indemnification as provided for in this paragraph, such indemnification shall first be effected by re-delivery of Initial Shares and then by set-off, against the Additonal [sic] Shares of D.C.A. stock to be delivered as hereinafter described, which right shall be asserted at the figure of $15 per share, to be adjusted for stock splits, stock dividends, etc., as hereinafter provided. To the extent that D.C.A. has

---

12. In pertinent part, section 13.11 reads: "[t]his Plan shall be governed by and construed and enforced in accordance with the laws of the State of Florida." D–2, § 13.11, at 49.

been unable to obtain complete indemnification by reason of Shareholders failure or refusal to re-deliver Initial Shares or by reason of the insufficiency of its right of set-off against Additional Shares it shall have the right to assert a general claim against the Shareholder at any time prior to December 31, 1973.

DB–1, Art. VI, at 15 to 16; Tr. 361–23 to –25. However, in the margin of the August 1, 1969, draft (hereinafter referred to as "August 1st Draft"), Exhibit DB–2, there are handwritten notations which would appear to suggest changes of the original language. Beck testified that "[a]t the bottom of the page my handwriting says: 'In no event shall DCA commence any cause of action under this agreement against the shareholders or any of them for any reason whatsoever after December 31, 1973.'" Tr. 52–19 to –22. He indicated that he made these notes "because ... the first paragraph talks about giving DCA the right of indemnification in respect to any loss, expense, liability and so forth resulting from any materially inaccurate representations made by the shareholder in this agreement. And Mr. Mayer wanted a cutoff date." Tr. 52–24 to 53–4. Mayer's testimony is in accord with these expressions. Mayer at 40 to 42; Tr. 271–10 to 276–23.

I also note that there are additional notations beneath those discussed above. These notations read: "Neither party to commence c/a vs other." DB–2, at 16. The words "Neither party" are then scratched out and "None of the parties" is written above them. Id. Beck explained that these changes were the result of his negotiations with Morris Sherman. Tr. 54–4. Interestingly, the phrase "for any reason whatsoever" was also deleted from the final Agreement.

When questioned as to the scope of these insertions, Beck testified that section 6.2 only related to section 6.1. Tr. 54, 61. This interpretation is corroborated by the testimony of Mayer. Tr. 272 to 277. Beck further indicated that if section 6.2 were intended to have a broader application, it would have been added as a separate and independent article. Tr. 62, 82. However, he averred that he had no recollection of discussing section 6.2 in the context of a separate article. Tr. 69.

During the course of Beck's testimony, I inquired of Beck concerning the utility of section 6.2 to his client in light of the concluding language in section 6.1. Recall that section 6.1 reads: "To the extent that D.C.A. has been unable to obtain complete indemnification ... it shall have the right to assert a general claim against the Shareholders at any time prior to December 31, 1973." D–2, § 6.1, at 27 to 28. I suggested the possibility that the interpretation pressed by plaintiffs might necessitate a finding that the limitation in section 6.2 was superfluous in light of the rights and limitation thereof in section 6.1. Tr. 57 to 61. Eventually, Beck responded to my inquiry by explaining that "Mr. Mayer wanted the head of the nail hit harder." Tr. 62–22. He conceded that "in hindsight, I don't know that we did." Tr. 63–1. When questioned about this difficulty, Mayer noted that "[n]ot every contract is perfect." Tr. 276–19.

The testimony of Morris Sherman is in direct contradiction to that of Beck and Mayer. Sherman testified that there was no discussion between Beck and himself limiting the effects of section 6.2 "in any way" to section 6.1. Tr. 362–18 to –22. Rather, Sherman stated that "Mr. Beck and I agreed that this would bar anybody from having any claims against any party after December 31st, 1973." Tr. 363–9 to –11; 366–2 to –14.

The testimony of Alvin Sherman on this point is not particularly favorable to the defendants. In fact, it is more consistent with the plaintiffs' witnesses' reconstruction of the event. Alvin Sherman indicated that section 6.2 was in the Agreement because "Henry Mayer was rather adament [sic] that once he got paid or completed his earn-out.... [h]e didn't want to be later subjected to any lawsuits, litigation or whatever. When he got paid he wanted to keep what he got and be done with it and the matter be closed." Tr. 119–4 to –13.

This testimony is entirely consistent with that of both Beck and Mayer.

A review of the various drafts of the agreement and the credible testimonial evidence before the court persuades me that plaintiffs' interpretation of the scope of section 6.2 is correct. The evidence strongly points to the conclusion that the time limitation contained in section 6.2 was intended to be limited in its application to those causes of action that might arise due to violation of rights set forth in section 6.1.[13] This is the testimony of the draftsman of the language in dispute and it is testimony that I find credible. I find extremely persuasive Beck's testimony that had he intended the time limitation to apply to the entire agreement he would have drafted section 6.2 as a separate article. Tr. 62, 82. This assertion is conceded by the defendants.

Another specter, however, haunts this Agreement. Yet, I find plaintiffs' explanation of this problem satisfactory. Since section 6.1 granted only DCA a right of indemnification for any loss resulting from misrepresentations made by Mayer and that section contained its own time limitation of December 31, 1973, the position taken by plaintiff, i.e., the December 31, 1973, limitation contained in section 6.2 is only applicable to the causes of action accruing under section 6.1, might require the court to interpret the contract in a manner which would render part of it superfluous. At trial, however, I noted that there is a distinction between superfluity and redundancy. The testimony of Beck persuades me that the language contained in section 6.2 is merely redundant. In Beck's own phraseology, section 6.2 merely hit the head of the nail harder. Tr. 62–22.

B. The Voting Agreement.

Another aspect of the parties' relationship is also important in resolving the instant controversy. During the preliminary negotiations, Mayer had expressed an interest in assuring himself representation on DCA's board of directors. D–1, para. XI, at 4. Despite the large block of DCA stock that Mayer would hold after the execution of the Agreement, he would not have been guaranteed representation on the board since DCA did not provide for cumulative voting.

It is undisputed that on or about July 21, 1969, Alvin Sherman forwarded to Mayer a proposed voting agreement (hereinafter referred to as "July 1969 Letter Voting Agreement"). In pertinent part, the letter stated:

> This will confirm, that upon the execution of the Agreement and Plan of Reorganization between Mayer Construction Co. and Development Corporation of America, you and we, have agreed to vote the shares of DCA respectively held by us, in the following manner:
>
> 1) So long as you shall hold at least 50% of the shares of DCA, received by you under the Agreement, we shall vote our shares, at all meetings held for the election of members of the Board of Directors of DCA, so as to insure that the Board of Directors will always contain one member nominated by you.
>
> 2) You shall vote all shares of DCA, held by you, at all meetings held for the election of members of the Board of Directors of DCA, in favor of all other directors as Alvin Sherman shall advise you.

D–4. Mayer denied having executed this draft, but admitted that it did constitute a "gentlemen's agreement." Mayer at 54, 58. The parties agreed at trial that as of July 1969 this agreement was no more than an "agreement to agree." Mayer would receive no DCA stock until the closing of the agreement. Furthermore, the next DCA stockholders meeting would not take place until June 1970. Tr. 378 to 380.

By cover letter dated May 11, 1970, Pedro Diaz, the vice-president and treasurer of DCA, forwarded to Mayer "a copy of a revision to our letter agreement of July 21,

---

13. The relevancy and necessity of this factual finding will become evident shortly, in light of the court's discussion of the controlling legal precepts. *Infra* at 855 to 858.

1969." D–7. Diaz requested that Mayer review it prior to the transmission of the executed original. The attached copy was back-dated to April 1, 1970, so as to be properly included in the DCA's 1970 proxy statement. Tr. 379; *see* Affd. of Henry D. Mayer and Plaintiffs' Exhibits Submitted in Connection with Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Ex. 5 Supplemental Formal Protest of Mayers, Dated March 9, 1978, Ex. 8, at 4. The only change from the July 1969 Letter Voting Agreement was the addition of a third condition. The condition was that "[t]his agreement between us shall terminate upon the earlier to happen of your death or December 31, 1980." D–7, at 2. Mayer approved the draft. By cover letter dated May 13, 1970, Diaz sent Mayer the original signed by Alvin Sherman, Irving Fishman and Edward Lempka. He requested that Mayer execute the original, return it to DCA and forward a fully executed copy to Gerald S. Backman, Esq., at Weil, Gotshal & Manges. D–8. Mayer complied with these requests and forwarded by cover letter dated May 18, 1970, an executed copy of the voting agreement (hereinafter referred to as "April 1970 Voting Agreement"), Exhibit D–5, to Backman.

Mayer was placed on the DCA board of directors in 1970. Furthermore, the April 1970 Voting Agreement was disclosed in DCA proxy statements through April 1974.

### C. The Delaware Litigation, Settlement Agreement and Releases.

In April 1973, plaintiffs' Additional Shares were released from escrow pursuant to the Agreement. *See* DT–4, para. 1, at 1. In early 1974, however, serious disputes arose between the parties. On March 28, 1974, Mayer was suspended from DCA's board of directors for alleged mismanagement of the affairs of the Mayer Corporation. Tr. 202.[14] He was also informed that

the April 1970 Voting Agreement would not be honored. At this time, Mayer was also removed as president of the Mayer Corporation. As a consequence of these actions, several lawsuits were filed by the parties in the spring of 1974 in both Delaware and Florida. The actions were then consolidated in the United States District Court for the District of Delaware.[15]

In these actions, Mayer alleged, *inter alia*, that the April 1970 Voting Agreement had been breached. However, in support of his contentions, he affixed to the various complaints a copy of the July 1969 Letter Voting Agreement rather than the later executed April 1970 Voting Agreement. D–9, D–10, D–11, Exhibit A. In an opinion filed with respect to various motions made by the parties in the Delaware litigation, the Hon. Murray M. Schwartz referred to the July 1969 Letter Voting Agreement as evidencing the terms of the voting agreement between the parties. In its discussion of the factual background, the court detailed two "ancillary agreements" executed pursuant to the Plan of Acquisition. *Mayer v. Development Corp. of America*, 396 F.Supp. 917, 920 (D.Del.1975). The first ancillary agreement was the employment contract between Mayer and the newly formed Mayer Corporation. The court continued:

In the second ancillary agreement, three DCA directors, Sherman, Fishman, and Lempka, agreed to vote their shares at all meetings held for the election of members of the DCA Board of Directors in such a way as to assure the election of at least one member nominated by Mayer. In return, Mayer agreed to vote his shares of DCA for the election of such nominees as Alvin Sherman might designate.

*Id.* at 920.

The other significant reference to the voting arrangement was in the court's dis-

---

14. The particulars of the various disputes between the parties are not germane to the present action. They are, however, aptly set forth in Judge Schwartz's opinion in *Mayer v. Development Corp. of America*, 396 F.Supp. 917, 919–921 (D.Del.1975).

15. A detailed procedural history of these actions is contained in *Mayer v. Development Corp. of America, supra.* Accordingly, I will limit my discussion of these cases to the facts pertinent to this decision.

cussion of Mayer's claim that the DCA proxy statement contained material misstatements and omissions in violation of section 14(a) of the 1934 Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9 thereunder. The opinion contained a detailed explanation of the proxy statement, including a reproduction of the proxy statement's discussion of the voting agreement. Footnote 12 of the opinion reproduced, in its entirety, the July 1969 Letter Voting Agreement. *Id.* at 925 n. 12.

Plaintiffs now contend that the July 1969 Letter Voting Agreement was erroneously attached to the complaints in these actions and that these findings of Judge Schwartz were incorrect. However, nothing was done to correct the record. Mayer contends that he did not wish to jeopardize ongoing settlement discussions.

In any event, a settlement agreement was entered into by the parties on August 25, 1975 (hereinafter referred to as "Settlement Agreement"). Exhibit DB–7. Of particular interest to the court is paragraph 12. In relevant part, it reads:

> The Agreement and Plan of Reorganization dated as of September 5, 1969, the Employment Agreement and letter of Voting Agreement, which are the subjects of C.A. 74–73, 74–98, and 74–106, shall be terminated as of the Closing [of the Settlement Agreement] and any obligation of ... HDM[ayer] to refrain from competing with DCA or MAYER CORP. shall thereupon cease and determine.

DB–7, para. 12, at 7.

Mayer testified that after the Settlement Agreement was executed in August 1975, he was informed by his accountant that "he, in turn, got in touch with the accountant for Development Corporation of America and was advised DCA had made certain deductions or claims in their tax returns." Tr. 229–11 to –13.[16] Mayer then requested Alvin Sherman "to send whatever information he had relative to the deduction which they had claimed which, on the other hand, would adversely affect me." Tr. 229–19 to –21. Sherman complied with this request by sending to Mayer, under cover letter dated September 12, 1975, a copy of a four page excerpt of an I. R. S. examining agent's report prepared in July 1975 concerning the imputed interest deduction aspect of DCA's 1973 Federal Income Tax return. Tr. 230; DT–2.

A review of the excerpt is enlightening. It is basically a discussion of the impropriety of DCA's attempted imputed interest deduction. The agent decreased DCA's claimed deduction by $596,673. On the last page of the excerpt, however, the I. R. S. agent writes:

> The instant case as in Rev.Rul. 70–120 and in Example 8, Reg. § 1.483–1(b) do [*sic*] not involve a deferred payment sales contract since, the shares deposited in escrow were issued in the names of the former stockholder of selling corporation and they are entitled to vote the stock and receive all dividends paid on such stock. Thus, all the shares of stock placed in escrow were transferred to the Mayer stockholders as of the effective date of the reorganization when they agreed on basic terms. *As in Mr. Sherman's letter of April 15, 1975*, if a voting agreement executed April 1970 is "ancillary" to the reorganization, then certainly modification and issuance of stock in escrow as finally agreed upon and issued in April 1970 would be also.

> The voting agreement that Mr. Sherman now holds as a severe restriction was of mutual benefit since neither group controlled enough votes independent of each

---

**16.** It is a matter of some confusion, however, when Mayer became aware of various tax actions taken by DCA. At trial, Mayer testified that his first awareness of DCA's attempt to reverse the tax-free treatment of the Agreement was in 1976. Tr. 231–4 to –6; 235–17 to 236–4. During cross-examination, however, it was highlighted that in prior deposition testimony he had indicated that he had been informed of DCA's attempt to upset the tax-free reorganization in September 1976. Tr. 245 to 246. I am convinced now, as I was at the time of trial, that the witness erroneously combined both the imputed interest deduction for 1973 and the attack on the tax-free reorganization for 1975 in his discussion of "tax-free." Tr. 247–4 to 248–20.

other to control an election. This is the only voting compromise and as stated in all Development Corporation documents relating to same, Mayer Corporation shareholders were given full voting rights on shares in escrow.

DT–2, at 5 (emphasis added). Thus, within the material supplied to Mayer there is a direct reference to a letter of Morris Sherman dated April 15, 1975. This letter was neither requested by Mayer nor voluntarily supplied by Alvin Sherman.

The letter, dated April 15, 1975, is directed to Alvin Sherman and contains Morris Sherman's discussion of Judge Schwartz's finding that the July 1969 Letter Voting Agreement was "ancillary" to the reorganization. After a lengthy discourse on certain Revenue Rulings and Judge Schwartz's finding, Morris Sherman posits:

it would certainly be my firm opinion that the shares of DCA received by Henry Mayer did not constitute "voting stock" because of the severe restrictions upon his right to freely vote for the election of directors. Therefore, the tax free nature of the exchange of DCA stock for Mayer's stock under the Reorganization Agreement of September 1969 is doubtful.

DT–1, at 2 to 3. Morris Sherman then discusses the imputed interest deduction. He writes:

The status of the Additional Shares finally delivered to Henry in April of 1973 as an 1973 transaction is also affected by this concept. As I remember, Pedro has advised me that the agent reviewing our "imputed interest" deduction is questioning our theory of a 1973 delivery because he claims Henry was given voting rights over the Additional Shares placed in escrow early in 1970. Now, however, if we follow the thrust of Revenue Ruling 72–72 it appears that Henry's voting rights in respect of these Additional Shares was so limited that he could not be said to have any real "voting rights" at all. As a matter of fact, since you retained the right to direct the voting of all of Henry's shares for eight out of the nine directors who were elected each year from 1969–1973 it may be said that you possessed the most important voting rights in respect of Henry's shares dating back to the time they were placed in escrow.

DT–1, at 3. Morris Sherman concluded by suggesting that Alvin Sherman review the letter "with John Cranshaw so that he may be properly armed in dealing with the Internal Revenue Service in these matters." *Id.* It is apparent that this letter in its entirety was provided to the I. R. S. by DCA in connection with its imputed interest controversy. DT–2, at 5. I also note that in DCA's formal Letter Protest to the I. R. S. in Miami, Florida dated October 20, 1975, positions similar to those put forth by Morris Sherman in his opinion letter are argued. DT–3.

Mayer also indicated that he told Alvin Sherman the excerpt from the Agent's Report was inadequate, but that he was told this was all the information Morris Sherman advised releasing. Mayer never requested a copy of DCA's tax return for 1973, although he believed, in light of the previous responses, that DCA would not have complied with this request. Mayer 121 to 123, 126 to 127, 138 to 140, 151 to 153.

It is not disputed that DCA in September 1974 filed its federal corporate income tax return for the tax year 1973 and claimed a $596,673 deduction for imputed interest expense with respect to those shares delivered to Mayer in April 1973. As detailed above, an I. R. S. field agent audited DCA's 1973 corporate tax return and decreased DCA's claimed deduction by $596,673. DT–2. In October 1975, DCA filed a protest with the Miami, Florida I. R. S. with respect to the proposed disallowance. DT–3. It appears that some favorable action may have been taken initially by the I. R. S. at the appellate conference level with respect to this expense deduction. However, at some subsequent point, DCA received formal notice that the I. R. S. was disallowing its claimed deduction. Thereafter, DCA filed a Petition for Redetermination with the tax court, Docket No. 8538–80, in which it as-

serted, *inter alia*, that the imputed interest expense deduction should be allowed. This matter is presently pending before the tax court.

The importance and relevancy of these findings become evident upon consideration of the exclusionary language contained in the Releases that were exchanged subsequent to the Settlement Agreement and the asserted defenses thereto. On the basis of the limited information supplied to him, Mayer then attempted to protect himself. Since the Settlement Agreement was already executed before Mayer obtained this information, Mayer and his counsel

> offered an alternative suggestion that the language in the releases be so phrased that in the event that litigation was necessary, that I would be able to recover my losses of any moneys that I would have to pay to IRS and the cost of, A, defending the case with the Internal Revenue Service and, B, the cost of any such experts as might be needed such as accountants, appraisers and so on; and, C, that I would be able to recover any costs necessary in litigation to effect such a collection procedure.

Tr. 238–2 to –11. On January 5, 1976, the Settlement Agreement closed and the Mayers executed general releases (hereinafter referred to as "Releases") in favor of DCA, Alvin Sherman, Fishman, Lempka, Stern and Diaz among others, in accordance with the Settlement Agreement. D–20; D–26. However, the Releases provided that:

> Any provision herein to the contrary notwithstanding, this Release shall not discharge or extend to, and shall not be construed as discharging or extending to, any obligations of the party hereby released under the abovementioned Settlement Agreement; nor shall this Release discharge or extend to, or be construed as discharging or extending to, such claims, if any, as each party executing this Release may have against the party hereby released for liability, loss, damage or expense (including consequential damages, counsel fees, professional fees, and expenses of defense or litigation, sustained

or incurred), arising from, related to or in any manner caused by or connected with any claims or demands against any of the Mayers for income taxes, penalties and interest, due or alleged to be due, to the extent such claims or demands are generated or occasioned by, or made as a direct or indirect consequence of any income tax deduction asserted or claimed by Development Corporation of America in any income tax return, amended return, or claim for refund or redetermination, with respect to any tax year through and including 1974, whether such deduction is either

> (1) for imputed interest under § 483 of the Internal Revenue Code or for alleged payments for personal services in connection with any distributions to any of the Mayers under the Agreement and Plan of Reorganization dated September 5, 1969; or

> (2) in connection with any other tax treatment asserted or claimed by Development Corporation of America which is wholly or partly inconsistent with, or contrary to (in whole or in part), the treatment expressly or by implication contemplated by the parties to the aforesaid Agreement and Plan of Reorganization at the time its provisions were negotiated and agreed upon.

D–20, at 2 to 3; D–26, at 2 to 3.

Mayer testified that these provisions were inserted to protect him from tax liability and expenses that could arise out of potential breaches by DCA. He indicated that the 1974 cut-off date was inserted to exclude any settlement of claims of which he was then aware. Tr. 266. He stated that Alvin Sherman had only advised him of DCA's 1974 deduction for imputed interest in connection with its 1973 tax return.

In my earlier summary judgment opinion I made several findings with respect to these Releases which must be reiterated at the present time. I found that at least " 'with respect to any tax year through and including 1974' " Mayer preserved the obligations imposed by section 13.10 of the 1969 Agreement "as well as the *alleged* implied

obligation of DCA not to assert a deduction for imputed interest by virtue of the exclusionary language in the releases." Slip. Op. at 15 (emphasis added). In light of my present finding that there was an obligation on the part of DCA not to take an imputed interest deduction, I must, of course, conclude that "the releases expressly preserved Mayer's rights in this regard." Slip Op. at 15.

With respect to the "§ 13.10 obligations", Slip Op. at 16, which plaintiffs contended survived the Releases, I questioned the validity of defendants' defense that it did not take any prohibited action within the preserved years. Plaintiffs had asserted that there had in fact been a breach of section 13.10 during the period preserved and, in the alternative, that the 1974 date was inserted as a result of material misrepresentations made by Alvin Sherman.

■ Factually, plaintiffs cannot prove all the requisite elements of their fraud claim. As I wrote in my earlier opinion, the plaintiffs in order to establish fraud must prove, *inter alia*, that their reliance upon defendants' representations was reasonable. Slip Op. at 18; *Louis Schlesinger Co. v. Wilson*, 22 N.J. 576, 585–86, 127 A.2d 13 (1956). Mayer admitted that he did not rely upon Alvin Sherman in September for advice in settling the Delaware litigation. Tr. 255. He did aver, however, that he relied on Alvin Sherman's veracity in supplying facts. Tr. 288 to 289. I think that Mayer's reliance upon the representations of Alvin Sherman at this stage of their relationship would be indicative of extreme business naiveté—a naiveté lacking in Mayer. It would be unreasonable for Mayer to rely upon the representations of Alvin Sherman. They had been engaged in litigation for the past two years. Obviously, no trust relationship existed between Mayer and Alvin

Sherman. Nor did Mayer rely upon Messrs. Sherman and Sherman for the drafting of the Releases. Tr. 171–12 to –23. To do so in light of the lengthy history of animosity between the parties would have been unreasonable. Tr. 202–209; D–15. He sought no advice from representatives of DCA regarding the contents of the Releases. His only discussions were with his own counsel. Tr. 266 to 267; 171. Since plaintiffs' failure to prove their fraud claim precludes a finding that DCA breached the contract by tax actions taken after the tax-year 1974, the loss deduction taken by DCA on its 1975 federal corporate tax return, filed in September 1976,[17] is not available to prove a breach of contract by DCA. *See* Slip Op. at 18 to 19.

As discussed above, *supra* at 845 to 846, however, there is uncontroverted documentary evidence now before me that in connection with its imputed interest controversy during the preserved years DCA contended that the consideration received by Mayer did not constitute "voting stock." Slip Op. at 19 to 20; *see* DT–1, DT–2, DT–3. Of course, if the DCA shares received by Mayer were not "voting shares," the 1969 Agreement clearly would not conform to section 368(a)(1)(B). Slip Op. at 17 and the case cited therein. This action was in contravention of DCA's section 13.10 obligation and within the time frame preserved by the Releases. The Releases except damages arising "as a direct or *indirect* consequence of any income tax deduction" taken through tax year 1974. D–20, D–26 (emphasis added). Thus, the argument made to the I. R. S. by DCA, although directly concerning the imputed interest deduction taken in the tax return filed in 1974, impairs the tax-free reorganization as an "indirect consequence" of the imputed interest deduction. Furthermore, section 13.10 does not require that an actual tax

---

**17.** In 1976, DCA took a deduction on its 1975 corporate tax return in connection with the liquidation of its Mayer Corporation subsidiary. The deduction was based on I.R.C. § 165(g) and could only be asserted by DCA on the premise that the 1969 Agreement was a purchase rather than a tax-free reorganization under I.R.C. § 368(a)(1)(B). The I. R. S. has not agreed with DCA's proposed treatment. DCA received formal notice from the I. R. S. disallowing its claimed deduction under § 165(g). Thereafter, DCA filed a Petition for Redetermination with the Tax Court in which it asserts, *inter alia*, that the foregoing deduction should be allowed. This matter is presently pending before the tax court.

deduction be taken to fall within its provisions. It imposes mutual obligations to refrain from "knowingly or deliberately tak[ing], maintain[ing] or defend[ing] any cause of action ... which may reasonably be construed as repudiating, conflicting with or being inconsistent with" a tax-free reorganization under section 368(a)(1)(B). DCA has not produced any evidence to prove that the scope of section 13.10 should be limited to the actual taking of a tax deduction.

### D. Mayers' Tax Liability.

On or about April 18, 1977, the I. R. S. in Newark, New Jersey advised the Mayers of proposed increases of their tax liability for 1969 and 1973. The joint tax returns of Henry and Marianne Mayer for 1969 and 1973 had been audited by the I. R. S. prior to September 1974 without any proposed changes relevant to the instant case. The proposed increases were based on two theories. First, it was asserted that the 1969 Agreement was not a tax-free reorganization under section 368(a)(1)(B). Thus, capital gain income was attributed to the Mayers for their exchange of stock in the Mayer Corporation for shares of DCA in the amount of $444,207.53 for 1969 and $1,279,824.45 for 1973. Second, it was asserted that a portion of the value of the Additional Shares received by the Mayers in 1973 represented an indefinite payment to which section 483 applied. Accordingly, unstated interest was imposed on the Mayers in the amount of $505,309.50 for 1973. As a result of the foregoing adjustments, the Mayers' tax liability was increased by $299,105.58 for 1969 and $1,252,616.90 for 1973.

After the Mayers submitted a Supplemental Protest to the Appellate Division of the I. R. S. at Newark, New Jersey, on April 30, 1980, the I. R. S. changed its position with respect to the Mayers' purported receipt of capital gain income. In particular, the I. R. S. advised the Mayers that it was accepting their 1969 tax return as filed, *i.e.*, it was withdrawing its claim that capital gain should have been reported by the Mayers in connection with their receipt of DCA shares as part of the 1969 Agreement. Thus, the I. R. S. accepted the Mayers' position that the transaction as structured under the 1969 Agreement was a tax-free reorganization pursuant to section 368(a)(1)(B). However, the I. R. S. maintained its position as to the Mayers' purported receipt of imputed interest income. The I. R. S. advised the Mayers that it "ha[d] determined that there is a deficiency [an increase] in your income tax" in the amount of $495,451.44. This tax increase resulted from the I. R. S. concluding that the "total fair market value of the [DCA] shares ... received in 1973 was an indefinite payment to which imputed interest under Section 483 of the Internal Revenue Code applies." In July 1980, the Mayers filed a Petition for Redetermination of Deficiency with the tax court, Docket No. 14486–80, to which the I. R. S. has filed an Answer. This matter is presently pending in the tax court. Accordingly, the potential tax liability of the Mayers at the present time is undetermined.

### E. Liability of Individual Defendants.

█ As I initially noted in this opinion, the plaintiffs alleged that certain conduct of Messrs. Sherman and Sherman constitute various tortious activity. However, in my summary judgment opinion I held that plaintiffs' allegations that defendants' conduct amounted to the intentional infliction of emotional distress could not be supported. Slip Op. at 25 to 29. Furthermore, I ruled in accordance with New Jersey case law that the individual defendants' liability for tortious interference with the contractual relations between Mayer and DCA was properly a question to be decided at trial since it involved "assessment of the 'good faith' *vel non* of the actions of those individuals." Slip Op. at 32.[18] Accordingly, I

---

18. In Count III of the complaint plaintiffs alleged that the actions of defendants were "not justified by any business reasons or ... good faith belief" in the tax positions taken, rather they were part of an effort to regain Mayers' DCA stock and were "motivated by personal malice and animosity towards" the Mayers. Complaint para. 39, 40.

indicated that this determination was "a fact question" which was inappropriate for disposition on a summary judgment motion. *Id.* I now address myself to the disposition of this factual question.

Evidence of this ill will and malicious intent allegedly surfaces from the communications between the parties during their discussions of Mayer's termination in late 1973 and early 1974. Several meetings were conducted in New York and Florida. Tr. 121 to 122, 130. At least one phone call was made to discuss the termination. Tr. 124. Mayer testified that during the course of these meetings various threats of financial ruin were made against him by Alvin Sherman. Tr. 210, 213, 215. Allegedly, Sherman demanded the return of all DCA stock then held by the Mayer group without any consideration in exchange. Tr. 206 to 207. In a phone conversation on March 29, 1974, Sherman admittedly raised the possibility of "negative tax implications to . . . [Mayer] if this thing got out into the public record. . . ." Tr. 125–7. Mayer dictated a memo memorializing his recollection of this phone conversation with Alvin Sherman. D–15. Although this memo is an entirely self-serving document, it sets forth what Mayer terms DCA's "charges" against him. It does not mention any threats nor does it make any reference to the malicious intent of Alvin Sherman.

Both Alvin Sherman and Morris Sherman deny any personal hostility toward Henry Mayer or any malicious interest in causing him financial harm.[19] Tr. 142, 400, 483 to 485. I find their testimony on these points credible. These alleged threats made against Mayer have been denied by both Alvin and Morris Sherman. Tr. 122 to 123, 130 to 131, 399. Mayer failed to produce any other witness to corroborate these alleged threats, including Messrs. Kleinman, German, Weinstock, Anton, Barnett or Dannenberg, all of whom are attorneys and were involved in great detail with the attempted resolution of this controversy. Tr.

130, 203. Furthermore, it is incredible to believe that Alvin Sherman, the president of a publicly held corporation, would make threats of ruination in the presence of numerous others and that none of these others would testify on plaintiffs' behalf. Furthermore, Mayer himself reveals what these alleged threats were, *i.e.*, discussions about the possibility of litigation to settle the controversy. Mayer testified:

Q Were there any threats made to you at that meeting, the one you have just told us about in Elliott Barnett's office?

A I think that they stated what course of action that they would follow.

Q Which was?

A Litigation.

Tr. 213–16 to –22.

The second major element of proof Mayer offered concerned the motive of the individual defendants for initiating DCA's decision to take the imputed interest expense deduction. As proof of the improper motivation, Mayer proposed that "the 1974 consideration by DCA and Alvin Sherman of an imputed interest deduction was prompted more by feelings for Henry Mayer than for DCA." Plaintiffs' Proposed Findings of Fact No. 136, at 36. Plaintiff also contends that the purpose of the deduction was to create leverage for the purpose of eliminating the Mayers as DCA stockholders "which would inure to the personal benefit of Alvin Sherman who would then resume his pre-Mayer status of being DCA's largest individual stockholder." *Id.* No. 139, at 37.

I am convinced, however, by the testimony of Messrs. Sherman and Sherman that the decision to take the deduction, as well as the timing of the deduction, was based on valid business reasons. With respect to the timing of the deduction, Morris Sherman testified that the possibility that DCA could claim an imputed interest deduction occurred to him during a review of his file on the Agreement. This review was requested by special litigation counsel re-

---

**19.** In fact, Alvin Sherman testified that DCA still maintains a business relationship with a

bank founded by Mayer. Tr. 147 to 150–19.

tained by DCA to handle the Delaware controversy. Tr. 387. Alvin Sherman testified that the DCA board of directors had decided to retain separate counsel to investigate the developing disputes and render an objective assessment of the situation. Tr. 126.

On April 30, 1974, Morris Sherman authored an opinion letter to Diaz, in which he set forth his opinion that "we are dealing ... with a situation in which the application of the unstated interest rule of Section 483 is required." DT–4, at 6. A review of this opinion letter coupled with a recognition of the proceedings before the I. R. S. leads me to find that the opinions set forth therein, as well as DCA's actions in reliance thereon, were not entirely devoid of either merit or advantage to DCA. Moreover, the ultimate decision to take the imputed interest deduction was made by Harris, Kerr & Foster, the certified public accounting firm for DCA. Tr. 127, 141. Morris Sherman is not and was not involved with the filing of the tax returns for DCA. He did not direct the taking of the imputed interest deduction. Tr. 398. Furthermore, Alvin Sherman also testified that he does not concern himself with tax matters. Tax matters are referred to the corporate treasurer and the accountants. Tr. 127. The fact that Alvin Sherman did not override the advice of the corporation's accountants is not support for the proposition that he was motivated by ill feelings toward Mayer. Tr. 152. The president of a publicly held company would be hard pressed to disregard the professional advice of the company's accountants when they advise the taking of a deduction of the magnitude involved in this case.

Third and finally, plaintiffs' attempt to support their allegations by evidence that during the interval between the signing of the Settlement Agreement and the execution of the Releases Alvin Sherman deceptively responded to Mayer's request for information on the imputed interest deduction. Recall that Alvin Sherman did not provide Mayer with a copy of DCA's 1973 tax return nor a copy of Morris Sherman's letter of April 15, 1975, explaining this de-

duction. Tr. 160 to 196; *see supra* at 845 to 846. This inadequate response to Mayer's request for material, however, is totally consistent with Alvin Sherman's testimony that he did not read the I. R. S. agent's report due to the fact that he does not generally become involved in the corporate tax matters. Tr. 127, 158 to 159. Of course, since Alvin Sherman did not read the I. R. S. agent's report, he would have no reason to have sent the April 15, 1975, letter of Morris Sherman. Again, I note that there is nothing in the record to indicate that Mayer ever requested a copy of this April 15, 1975, letter.

On the basis of the evidence before me, I find that plaintiffs have failed to prove that the individual defendants, Morris Sherman and Alvin Sherman, engaged in conduct which was a tortious interference with the business relations between DCA and plaintiffs. Plaintiffs have not proved as required that the individual defendants " 'wilfully and maliciously induc[ed] their company to breach its contract' with another party." Slip Op. at 31 (*quoting General Capital Corp. v. U. S. Family Sporting Goods, Inc.*, 351 F.Supp. 364, 367–68 (N.D.Ill.1972)). Likewise, defendants have offered credible evidence to prove that they, as officers of DCA, acted in good faith and/or in the best interest of the corporation by seeking to have the corporation breach its contract with Mayer.

## II. Conclusions of Law

### Breach of Contract

As I explained at the beginning of this opinion, plaintiffs premised their cause of action on allegations that the actions taken by defendants in connection with DCA's claim for an imputed interest expense deduction and investment loss deduction constituted a breach of contract and various torts. Individual liability of the defendants Alvin and Morris Sherman was predicated upon the theories of intentional infliction of emotional distress [20] and tortious interfer-

---

**20.** This claim was disposed unfavorably to the plaintiffs in my earlier summary judgment

opinion. Slip Op. at 25 to 29.

ence with contractual relations between the plaintiffs and DCA. For relief, plaintiffs seek a declaratory judgment that these actions of DCA constitute a breach of the 1969 Agreement and that the actions of the individual defendants constitute tortious interference with the said contractual relation. Plaintiffs pray for an award of compensatory damages measured in part by the amount of tax, interest and penalty which may be found due and owing by plaintiffs to the I. R. S., as well as all costs and expenses incurred by plaintiffs in connection with the I. R. S. assessment against them. Plaintiffs also seek the award of punitive damages on all counts. However, I must note that the October trial went only to the issue of liability and if the defendants are found liable, subsequent hearings are necessary to determine the amount and elements of damages.[21] Tr. 242. These hearings would, in effect, further delineate the scope of the exclusionary language within the Releases. *See* D–20, at 2 to 3; D–26, at 2 to 3; *supra* at 37 to 38.

As explored in great detail above, I have found that the parties reached an understanding in 1969 that, regardless of any potential entitlement under the Internal Revenue Code, DCA would contractually forego its right to claim a subsequent tax deduction for imputed interest expense arising out of this transaction. The propriety of this determination becomes evident once consideration is given to *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770 (3d Cir. 1972). In *Emor*, the Court explained:

Contract law has developed rules to deal with such latent ambiguities:

... the meaning given to the words by one party should be given effect if the other party knew or had reason to know that it was in fact so given. If the words of the contract are to be attributed to both parties alike, in equal degree, it can not in advance be determined which party's meaning should be made effective. It is then necessary to determine whether either party knew or had reason to know the meaning that was actually given to the words by the other party. (footnote omitted)

3 Corbin, On Contracts, § 537, at 51–52 (1960).

This rule has been stated in a variety of contexts, in many cases. For example, in *Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725, 192 Ct.Cl. 310 (1970), the court said:

A party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant. (citations omitted.)

Equally apt is the language in *Cresswell v. United States*, 146 Ct.Cl. 119, 173 F.Supp. 805, 811 (1959):

If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. *The same is true if he had reason to know what the other party intended...* (citations omitted.)

**21.** Several questions arise concerning the damage evaluation which cannot be definitively settled at the present time. First, I must note that there is not direct evidence linking the tax deduction taken by DCA for 1973 with the deficiency assessment made against the Mayers in 1977. In light of the dualistic nature of our taxing system, however, the inference is unavoidable that DCA's deduction spurred the I. R. S. reconsideration of the Mayers' 1969 and 1973 tax returns. *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 14.01, at 14–7 (4th ed. 1979). Recall that these returns of the Mayers had previously been audited without any proposed changes relevant to the instant matter. However, the inability to prove at the present time the direct correlation between DCA's tax deduction and the assessment against the Mayers is not fatal. The direct link in the causal chain will not be revealed until a final determination on the tax issues by the appropriate authorities.

It also appears that the plaintiffs are not able presently to distinguish the attorneys' and accountants' fees incurred opposing the imputed interest assessment from those incurred supporting the tax-free nature of the reorganization until most recently, *i.e.*, when the I. R. S. withdrew its deficiency assessment and accepted Mayer's argument that the reorganization was in compliance with § 354(a)(1)(B).

As the preceding language makes clear, it is not necessary that the party *actually know* the other party's intent; it is enough that he had "reason to know." 467 F.2d at 775 (emphasis in original). It is undisputed that on its 1973 tax return DCA took such a deduction. The issue whether such conduct is an actionable breach of contract in light of the various defenses raised by the defendants will be determined shortly.

■ I have also found that DCA breached the contractual obligation contained in section 13.10 and preserved by the Releases when during 1974 and 1975 it argued in support of its imputed interest deduction for the 1973 tax year that the DCA shares received by Mayer were not "voting shares." Recall that the Releases excepted damages arising "as a[n] . . . indirect consequence of any income tax deduction" taken through the tax-year 1974. Thus, although DCA's argument directly concerned the imputed interest deduction taken for 1973, DCA also impaired the tax-free reorganization as an "indirect" consequence thereof. Whether this breach is actionable will also be determined below.

Yet, I have found that, as a direct consequence of the Releases, plaintiffs are foreclosed from claiming that DCA breached the express understanding of the parties as set forth in section 13.10 when it took an investment loss deduction on its 1975 tax return on the premise that the transaction was not a tax-free reorganization. As a necessary predicate to this finding, I determined that the plaintiffs failed to prove that the time limitation contained in the Releases was a result of material misrepresentations by the individual defendants. The evidence presented by both parties when viewed in its entirety convinced me that any reliance by the plaintiffs upon the defendants during the negotiations of the Settlement Agreement and subsequent Releases would have been unreasonable. I have also found, as a matter of fact and in conjunction with the legal standards set forth in my earlier summary judgment opinion, that the plaintiffs have failed to prove that the individual defendants, Morris and Alvin Sherman, engaged in conduct which was a tortious interference with the business relations between DCA and plaintiffs. They did not prove, as they are required, that the individual defendants " 'wilfully and maliciously induc[ed] their company to breach its contract' with another party." Slip Op. at 31. Furthermore, the defendants proved that they acted in the best interest of the corporation.

In light of the findings of fact summarized above and my earlier summary judgment opinion, it is instructive to state those issues which remain for determination. Initially, I must note that the action has boiled down to a breach of contract suit. *Stern & Co. v. State Loan & Finance Corp.*, 205 F.Supp. 702 (D.Del.1962). The causes of action based upon the individual defendants' allegedly tortious conduct, *i.e.*, intentional infliction of emotional distress and tortious interference with contractual relations, have been dismissed.[22] The former cannot stand as a matter of law. The latter failed due to a lack of proof. Of course, the prayer for punitive damages against the individual defendants on these causes must likewise fall.

As to the remaining action for breach of contract, certain defenses are asserted which would allegedly bar plaintiffs' recovery. In general, DCA urges the following arguments: section 6.2 is a contractual limitation which bars the present suit; the implicit agreement to forego an imputed interest expense deduction, regardless of entitlement, is illegal and, therefore, unenforceable; the Releases bar the instant action; and, the obligation imposed upon DCA by section 13.10 was discharged by plaintiffs' material breach of that provision. Finally, assuming *arguendo* that the plaintiffs are able to negate these various defenses and thus prove an actionable breach

---

**22.** Throughout this opinion I have referred to the corporate and individual defendants collectively as "defendants." Since DCA now remains as the sole defendant, my reference is changed to "defendant."

of contract, I must then make a factual determination whether there exists a "sufficiently 'aggravated set of facts' to warrant imposition of punitive damages." Slip Op. at 33. I now address myself to a more detailed discussion of each of these issues.

## Defenses

### 1. Section 6.2.

In its entirety, section 6.2 of the Agreement provides:

None of the parties hereto shall assert any claim against any other party, arising out of or relating to this Agreement after December 31, 1973.

D–2, § 6.2, at 28. In their earlier summary judgment motion, defendants contended that this contractual provision bars the instant litigation which was commenced much later than December 31, 1973. However, the plaintiffs have raised several arguments in their attempt to vitiate the effect of this provision. They contend: first, the limitation contained in section 6.2 is in derogation of Florida law, which law has been chosen by the parties to control the interpretation of the contract; second, under New Jersey law, the section 6.2 limitation is unreasonable and, therefore, unenforceable; third, although paragraph 12 of the 1975 Settlement Agreement "terminated" the Agreement, including the section 6.2 time limitation, the Releases incorporated therein preserved plaintiffs' claims with respect to the imputed interest expense deduction and the section 13.10 obligations; fourth, the defendants waived the section 6.2 limitation when they instituted litigation against the plaintiffs in Delaware; and fifth, the section 6.2 limitation if viable is only applicable to section 6.1. The first two arguments have previously been rejected and I will not repeat my reasoning here. Suffice it to state that I incorporate by reference the rationale on these issues set forth in my earlier opinion. Slip Op. at 10 to 13, 14. The three remaining points, however, merit closer attention.

### A. The Impact of the Settlement Agreement and Subsequent Releases.

■ The lack of merit for this argument is reflected somewhat by the attention given to it by its proponents. Plaintiffs contend:

As a final alternative reason for denying the Defendants' . . . Judgment based upon Section 6.2 of the Agreement, it is respectfully noted that, except for certain preserved rights relating to imputed interest and the tax-free status of the Agreement which the parties specifically excepted from their negotiated settlement, the parties "terminated" the Agreement in 1975. Consequently, the bar of its contractual limitation upon the general statute of limitations has been removed by the parties.

Plaintiffs' Memorandum of Law in Support of Their Proposed Conclusions of Law at 12. The error in this logic is apparent, however, once one examines the language of the Releases and my earlier interpretations thereof. I have stated that "[t]he broad termination language in paragraph 12 [of the Settlement Agreement] must be construed in light of the express exceptions and claims preserved by the releases and limited by the provisions contained in the releases." Slip Op. at 16. The Releases themselves did not discharge

such claims, if any, as each party executing this Release may have against the party hereby released . . ., arising from, . . . any claims . . . against any of the Mayers for income tax . . . for imputed interest . . . under the Agreement and Plan of Reorganization . . .; or . . . any other tax treatment . . . inconsistent with . . . the treatment expressly or by implication contemplated by the parties to the aforesaid Agreement . . . *at the time* its provisions were negotiated and agreed upon.

D–20, at 2 to 3; D–26, at 2 to 3 (emphasis added). It is obvious that the reservation of rights by Mayer is predicated upon whatever rights he may have had under the 1969 Agreement. As the highlighted language indicates, it was the expressed intention of the parties to reserve to Mayer claims which might arise from action contrary to

the treatment contemplated by the parties "at the time" the Agreement was negotiated and the relationship structured. At that time, the parties contemplated a time limitation, as set forth in section 6.2, with respect to certain claims. Accordingly, when construing the language of the Releases, I must give due consideration to all provisions in the 1969 Agreement which cast light on the nature of the claims reserved. Although the Settlement Agreement "terminated" the 1969 Agreement, the claims reserved by the Releases which are the subject matter of this suit have their genesis in that Agreement and therefore are subject to whatever limitations that Agreement placed upon them.

### B. Defendant's Waiver of Section 6.2 and

### C. Limited Applicability of Section 6.2.

Since these last two arguments are to some extent mutually exclusive, I will discuss them simultaneously. A rejection of one strongly suggests an acceptance of the other. With respect to the alleged waiver by the defendant of the present application of section 6.2, plaintiffs assert that the defendant's initiation of litigation against them in Florida in 1974, which eventually was transferred to Delaware, evinces a waiver of the present application of that section's time limitation. In contrast to this assertion, defendant argues that the court should draw no inference from the Delaware litigation since the section 6.2 limitation was never put in issue by the plaintiffs. Furthermore, DCA notes that the plaintiffs have not adduced any proof that it intentionally relinquished a known right.

Several arguments ancillary to these, however, run directly in favor of plaintiffs' position that section 6.2 is of limited applicability. In addition to its arguments against waiver noted above, DCA also posits that the time limitation of section 6.2 was

not applicable to the 1974 Delaware litigation since that litigation was based on alleged violations of the voting agreement and employment agreement, not the 1969 Agreement of reorganization. In other words, defendant contends that section 6.2 is of limited applicability, but not to the extent asserted by plaintiffs. Furthermore, the failure of the Mayers to raise section 6.2 as a defense in the Delaware suit might be viewed as consistent with their present contention that it only applies to claims arising out of section 6.1.

Plaintiffs assert that section 6.2 relates only to section 6.1 and, therefore, the time limitation does not bar the present action. Plaintiffs contend that

> the final sentence of Section 6.1 is, at best, ambiguous if it is suggested that this language attempts to impose an absolute bar to any post-1973 claim for indemnification by DCA against the Mayers. Consequently, the testimony of Messrs. Mayer and Beck that they attempted to hit the head of the nail harder makes sense only if Section 6.2 is restricted to limiting the provisions of Section 6.1, . . ."

Plaintiffs' Memorandum of Law in Support of Their Proposed Conclusions of Law at 9.[23] Defendant responds by arguing that the "clear language" of section 6.1 militates against this interpretation since it would render section 6.2 mere surplusage. It argues that plaintiffs' interpretation is contrary to standard contract principles which require the court to interpret language so as to give effect to all terms and eschew any interpretation which renders a clause meaningless.

■ A leading commentator in this area has written:

> Performance of a condition may also be excused by waiver.

---

**23.** I must note that plaintiffs' interpretation of the court's function in this instance is erroneous. I do not attempt to "make sense" of the testimony of the witnesses so as to support the party's position of what contract language should mean. Rather, I attempt to "make sense" of contract language in light of the par-

ties' contention as supported by the testimony of their witnesses. There could be a panoply of reasons why a party's witness' testimony could diverge from certain documentary evidence in a case other than the inaccuracy of a party's legal contentions.

. . . .

Waiver is usually defined as "the voluntary and intentional relinquishment of a known right"; words of similar import are frequently used by the courts:

"A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed. It is the voluntary act of the party and does not require or depend upon a new contract, new consideration or an estoppel. It cannot be recalled or expunged.... A waiver may be either verbal or in writing; and it is not necessary that the waiver should be direct and positive. It may result from implication and usage, or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended. The assent must, however, be clearly established and will not be inferred from doubtful or equivocal acts or language."

5 S. Williston, *Law of Contracts* § 678, at 238 to 240 (3d ed. 1961) (footnotes omitted). The author, however, notes that this definition is problematic unless it is considered in connection with particular contracts. *Id.* § 679, at 245 to 247. Likewise, the New Jersey Supreme Court has indicated that "[i]n dealing with 'waiver' one must keep in mind that the term is used loosely to embrace a number of concepts.... These several concepts are distinct and vary in their elements. Hence it would be a mistake to apply a definition, useful for one purpose, to a situation for which it was not intended." *Merchants Indemnity Corp. v. Eggleston*, 37 N.J. 114, 130, 179 A.2d 505 (1962) (citation omitted). With due consideration given to this contract and the surrounding circumstances, the most appropriate definition of waiver would be "[a] promise express or implied without consideration to give up a defense which has already arisen or to be liable in spite of an excuse which has already freed the promisor, . . ." S. Williston, *supra*, § 679, at 255. Thus, I must decide whether plaintiffs have shown that the initiation of the Florida-Delaware action by DCA constituted such a promise.

■ There is a dearth of evidence relating plaintiffs' assertion of waiver to the defendant's initiation of the prior action. The record before me does not even contain the pleadings filed in *Development Corp. of America v. Mayers*, Civ.Action No. 75–143 (S.D.Fla., May 30, 1974). The only pleadings from prior litigation between the parties that are in the record are the complaint, amended complaint and amended and supplemental complaint filed by plaintiffs against DCA in 1974 in Delaware. D–9, D–10, D–11. The most detailed reference I have to the Florida-Delaware action is in Judge Schwartz's opinion in *Mayer v. Development Corp. of America, supra.* Judge Schwartz explains:

On May 30, a third suit was filed by DCA and the Mayer Corporation in the Southern District of Florida. The Florida complaint includes one count of fraud alleging that Mayer concealed from DCA in connection with its acquisition of the Mayer Corporation certain material facts relating to the latter's financial prospects, all in violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 thereunder. Additionally, five common law counts alleging fraud, disloyalty, appropriation of corporate opportunities, and breach of contract were filed. It is the stated intention of DCA and the Mayer Corporation to interpose these counts as affirmative defenses and compulsory counterclaims in the Delaware actions.

*Id.* at 920–21. From this meager evidence I cannot conclude that DCA promised to give up the defense of section 6.2. Even if I were to apply the broader definition set forth above, *supra* at 855 to 856, there is no evidence before me concerning DCA's intentional relinquishment of a known right. *See Sherwood Jewelers-Newark, Inc. v. Philadelphia Nat'l Ins. Co.*, 102 F.Supp. 103, 104 (D.N.J.1952). Accordingly, I find that the defendant did not waive the application of section 6.2 to the present suit by the initiation of the Florida-Delaware litigation in 1974.

■ I do, however, find persuasive plaintiffs' argument that the time limita-

tion of section 6.2 is limited in its application to those claims arising under section 6.1. At first blush, the language of section 6.2 appears clear and unambiguous. Recall again that it reads:

> 6.2 None of the parties hereto shall assert any claim against any other party, arising out of or relating to this Agreement after December 31, 1973.

D–2, § 6.2, at 28. However, it is a standard tenet of contract interpretation that the contract is to be considered as a whole and effect given, wherever possible, to all its parts. *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556 (3d Cir. 1973). "An interpretation which gives effect and meaning to a term is to be preferred over one which makes such term mere surplusage or without effect." *Rossville Salvage Corp. v. S. E. Graham Co.*, 319 F.2d 391 (3d Cir. 1963). Yet, application of these principles to the contract presently under consideration creates difficulty. As noted earlier, a review of the entire Agreement reveals that Article VI contains only two sections, both of which contain the same time limitation. If, as urged by the defendant, I were to decide that the section 6.2 limitation applied to the entire Agreement, I would render the limitation contained in section 6.1 surplusage. Conversely, plaintiffs' proposal appears to be in contravention to the common meaning of the language in section 6.2. Fortunately, the Third Circuit has provided guidance to trial judges who are faced "with the difficult issue of determining as a matter of law which category written contract terms falls into—clear or ambiguous." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir. 1980). The *Mellon Bank* Court explained:

> Ambiguity is defined as:
>
> > Intellectual uncertainty; ... the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time ...
>
> Webster's Third New International Dictionary (unabr. 1971).
>
> A court must have a reference point to determine if words may reasonably admit of different meanings. Under a "four corners" approach a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous. An alternative approach is for the judge to hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings. We believe the latter to be the correct approach.
>
> It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.... If a *reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder. *See* Corbin, Contracts § 542.

619 F.2d at 1011 (emphasis in original; footnote omitted). Of course, as the finder of both fact and law in this non-jury case, the dichotomy of function dealt with in *Mellon Bank* is not here applicable. Moreover, the propriety of considering, as I have done here, statements made during preliminary negotiations between the parties as an aid in interpretation long ago became an element of hornbook law. 3 *Corbin on Contracts* § 543, at 130 to 155 (1960); Restatement of Contracts § 242 and Comment *a*, at 341 to 342 (1932).

The "alternative meaning" suggested by plaintiffs' counsel in the present case is both *reasonable* and supported by objective evidence. That evidence has been discussed in great detail earlier in this opinion and I need not restate it here. *Supra* at 841 to 843. Suffice it to state, that in their attempt to hit the head of the nail harder, Tr. 62–22, plaintiffs inadvertently introduced into the Agreement an element of redundancy, not superfluity. I also find factual support for my finding that an ambiguity exists in the contract when I consider the testimony of Morris Sherman. On cross-examination, Morris Sherman testified:

There is—I recognize ... a certain amount of distortion and perhaps ambiguity in certain areas of the agreement which is the result, ... of the fact that [we] took my original draft and then graft ... upon it this 5.2B ...

Tr. 436–17 to –21; 437. Although Morris Sherman flatly denied that this grafting process, which also occurred with respect to sections 6.1 and 6.2, created any ambiguity in those sections, Tr. 438–1 to –8, it is obvious that I find otherwise and, accordingly, discredit this aspect of his testimony. Accordingly, I hold that the time limitation contained in section 6.2 is only applicable to those causes of action arising from section 6.1. Thus, section 6.2 does not bar the present action.

2. *Alleged Illegality and Unenforceability of an Implicit Agreement to Forego an Imputed Interest Expense Deduction.*

[9] Defendant contends that the implicit agreement to forego their imputed interest expense deduction, assuming such an agreement is found to exist, is illegal and, therefore, unenforceable. Defendant states:

If, within the bounds of the Internal Revenue Code, the parties make an agreement which they verily believe does not entitle one or the other party to validly claim a tax deduction, then the agreement is enforceable. However, it is quite a different story if one party is entitled to claim a deduction and then is contractually bound not to advise the Internal Revenue Serice [*sic*] of the proper application of the Internal Revenue Code by failing to take the deduction.

26 U.S.C. § 7206(1) compels taxpayers to file true and accurate tax returns. A party who is entitled to claim a deduction on its income tax return and does not claim said deduction fails to advise the Internal Revenue Service of essential characteristics of certain transactions which enable it to make its independent determinations of the tax consequences of that transaction.

Defendants' Memorandum of Law in Support of Their Conclusions of Law at 3. Defendant raised a similar argument with respect to the enforcement of section 13.10 in its summary judgment motion. At that time, I determined that its argument was without merit. I now hold that my rationale with respect to the alleged illegality of section 13.10 is equally applicable to the implicit agreement to forego an imputed interest deduction.

Specifically, defendant contends that 26 U.S.C. § 7206(1) renders the implicit agreement illegal. That section provides:

Any person who—

*(1) "Declaration under penalties of perjury.*—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; ...

. . . .

shall be guilty of a felony . and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, ...

26 U.S.C. § 7206(1). In holding that section 13.10 was not violative of this statute, I reasoned:

Section 13.10 was an agreement between two parties to preserve an agreement which was consistent with the tax laws. The agreement simply was that neither party was to take any action which would cause the legitimate tax position to be jeopardized. There is nothing illegal about a tax-free reorganization or an agreement to preserve the transactions' tax-free status. There is nothing in the factual complex of this case that suggests that either party was obligated by § 13.-10 to wilfully file a materially untrue tax return to preserve the tax-free status of the Agreement. Controversy often arises as to the taxability of a transaction without involving wilfully false returns.

Slip Op. at 34. Like section 13.10, the implicit agreement to forego an entitlement to an imputed interest deduction does not contravene the fraud statute, but merely requires the parties not to take any action

that would jeopardize a legitimate tax position previously agreed upon. Furthermore, contrary to defendant's characterization of the agreement as quoted above, the transaction was structured so as to support the belief that neither party had a valid claim for this deduction. As previously noted, defendant concedes that such an agreement is enforceable. Defendant's interpretation of the law is not erroneous, but its characterization of the implicit agreement is inaccurate. As in *Stern & Co. v. State Loan & Finance Corp., supra,* a case strikingly similar to the instant matter, the suggestion of illegality is absent. Section 7206 does not render the implicit agreement to forego an imputed interest expense deduction illegal. Therefore, such an agreement is enforceable.

*3. Scope of the Releases.*

Throughout this litigation, defendant has pressed the argument that the Releases which emanated from the 1974 litigation bar the present action. As explained in this opinion and my earlier summary judgment opinion, I have not found this argument entirely persuasive. However, I have accepted it with respect to the action taken by DCA on its 1975 federal corporate tax return filed in September 1976. In construing the phrase "indirect consequences" contained in the Releases, I also determined that certain arguments made by DCA to the I. R. S. directly concerning their 1973 deduction for imputed interest indirectly impaired the tax-free reorganization and, therefore, were actionable violations of the Agreement. *Supra* at 848 to 849. Although neither party in their post-trial briefs has specifically placed in issue the Releases, the scope of the Releases and the propriety of this court's interpretation of them were issues that I specifically reserved in my summary judgment opinion for consideration after trial. Slip Op. at 20.

█ The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument considered in light of all the facts and circumstances. *Bilotti v. Accurate Forming Corp.,* 39 N.J. 184, 203–204,

188 A.2d 24 (1963); *see Shlensky v. B. R. Dorsey,* 574 F.2d 131, 144 (3d Cir. 1978); *Redel's Inc. v. General Electric Co.,* 498 F.2d 95 (5th Cir. 1974). My determination that the reservation of rights by Mayers in the Releases preserved for them a cause of action based upon DCA's 1973 imputed interest deduction and arguments made in support thereof is drawn from the expansive language contained in the Releases as well as the testimony of the plaintiffs' witnesses as to the circumstances surrounding the execution of these documents. *Supra* at 845 to 847. The exclusion in the Releases run to liability

> in *any* manner caused by or connected with *any* claims . . . against . . . the Mayers for income taxes, . . . to the extent such claims . . . are generated or occasioned by, or made as a direct or *indirect consequence* of *any* income tax deduction asserted by Development Corporation of America . . . whether such deduction is either
>
> (1) *for imputed interest* under § 483 . . .; or
>
> (2) in connection with *any other tax treatment asserted* or claimed by Development Corporation of America which is wholly or partly *inconsistent with,* or contrary to (in whole or in part), the treatment expressly or by implication contemplated by the parties to the . . . Agreement . . . at the time its provisions were negotiated and agreed upon.

D–20, at 2 to 3; D–26, at 2 to 3 (emphasis added). This language lends itself to a broad interpretation of what tax actions the parties intended to exclude from operation of the Releases. A literal reading of this language clearly encompasses and preserves the breaches that I have found to have occurred. The defendant, who pleads these Releases as an affirmative defense and thus carries the burden of establishing their meaning, has not introduced evidence to convince me to interpret this language in any other manner than that which appears obvious. *See Eulo v. Deval Aerodynamics, Inc.,* 430 F.2d 325, 328 (3d Cir. 1970).

### 4. Plaintiffs' Material Breach of Section 13.10.

As noted earlier, section 13.10 imposed mutual obligations upon the parties to refrain from "knowingly or deliberately tak[ing], maintain[ing] or defend[ing] any course of action or position which may reasonably be construed as repudiating, conflicting with or being inconsistent with the interest of the parties" that the stock exchange would be a tax-free reorganization within the meaning of section 368(a)(1)(B).

Another argument made by the defendant in support of their motion for summary judgment, which is renewed at the present time, is that any obligation that might have been imposed upon it by section 13.10 was discharged by plaintiffs' material breach of that section. Specifically, defendant contends:

(1) Henry Mayer disclosed the existence of the alleged 1969 voting agreement in connection with the Delaware litigation; (2) Judge Schwartz found, in that litigation, that the 1969 voting agreement was an "ancillary" agreement to the acquisition Agreements; (3) this disclosure constituted a breach of § 13.10 in that it amounted to a determination or admission that consideration other than voting stock of DCA had been exchanged in the 1969 Agreement, thereby disqualifying the 1969 Agreement as a tax-free reorganization; (4) plaintiffs' breach was a sufficiently material breach so as to discharge defendants' obligations under § 13.10.

Slip Op. at 20 to 21; Defendants' Memorandum of Law in Support of Their Proposed Conclusions of Law at 11. When I denied defendants' prior motion on this issue, I indicated that the "intended scope of § 13.-10 is not clear to me as a matter of law." Slip Op. at 22. I clarified that ruling by stating that at trial defendants could prove that "section 13.10 was intended to apply to the actions taken by plaintiffs in connection with the Delaware litigation in 1974," as well as prove that the breach was material. *Id.* Defendant has not presented such proof.

Plaintiffs' disclosure in the Delaware litigation of the unexecuted July 1969 Letter Voting Agreement was not a breach, much less a material breach, of their obligations under section 13.10. The essence of those obligations was to forebear from asserting any position or taking any action which repudiates, conflicts or is inconsistent with the reorganization's continued efficacy under section 368(a)(1)(B). The Delaware litigation instituted by the plaintiffs was based upon, *inter alia*, a violation of the voting agreement. A review of the numerous complaints filed by plaintiffs in that action do not reveal any position repudiating, conflicting or inconsistent with the continued viability of the tax-free nature of the reorganization. Judge Schwartz's reference to the July 1969 Letter Voting Agreement as "ancillary" to the reorganization was not a determination of an issue presented to him by the plaintiffs. It was merely a prefatory "factual" statement and certainly not the *ratio decidendi* on any legal argument or position taken by the plaintiffs.

Furthermore, the crucial connection between Judge Schwartz's characterization of the July 1969 Letter Voting Agreement as an "ancillary" agreement and a determination by the I. R. S. that this agreement constitutes the talismanic "boot" is too attenuated for me to draw. *Stern & Co. v. State Loan & Finance Corp., supra.* The evidence before me indicates that defendant's tax argument, *i.e.,* the Delaware district court's finding that the July 1969 Letter Voting Agreement was an "ancillary" agreement is tantamount to a finding of "boot", has not been accepted by the I. R. S. It is uncontested that the deficiency assessment against the Mayers arising from DCA's 1975 assault on the reorganization has been withdrawn. The inference is unavoidable that the I. R. S. did not view the April 1970 Voting Agreement as "boot". Findings that the April 1970 Voting Agreement was "boot" and that the reorganization was tax-free are mutually exclusive. *See Helvering v. Southwest Consol. Corp.,* 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789

(1942); B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 14.13, at 14–37 *et seq.* (4th ed. 1979). Furthermore, the I. R. S. agent auditing DCA's 1973 tax return was informed of Judge Schwartz's characterization of the Letter Voting Agreement as "ancillary." Rather than finding that the agreement constituted "boot", the agent reported:

> The voting agreement that Mr. Sherman now holds as a severe restriction was of mutual benefit since neither group controlled enough votes independent of each other to control an election. This is the only voting compromise and as stated in all Development Corporation documents relating to same, Mayer Corporation shareholders were given full voting rights on shares in escrow.

DT–2, at 5. Again, although I am aware that this determination, *i.e.*, whether the voting agreement constitutes "boot", is not within my scope of inquiry, the evidence just discussed goes to a determination of the "reasonable" construction which I must give to plaintiffs' actions in Delaware under section 13.10. It would be unreasonable to construe plaintiffs' initiation of the Delaware action and disclosure of the July 1969 Letter Voting Agreement as action deliberately taken to repudiate the parties' intention that the transaction remain a tax-free stock exchange in light of the circumstances surrounding Judge Schwartz's characterization of the agreement as "ancillary", the subsequent determinations by the I. R. S. and the admitted disclosures of the April 1970 Voting Agreement by DCA beginning in 1970 in its annual proxy statement. Accordingly, I hold that defendant has failed to prove the alleged breach of section 13.10 by the plaintiffs.

### 5. Summary.

■ I have ruled that the various defenses asserted by the defendant are in substantial part without merit. In particular, section 6.2 is not a contractual bar to the initiation of these actions. The agreement to forego an imputed interest expense deduction implicit in the Agreement is not illegal. The Releases executed after the Delaware litigation do not bar the present action. Finally, the revelation by the plaintiffs of the July 1969 Letter Voting Agreement when they initiated suit in Delaware was not a breach of their obligations under section 13.10. Therefore, defendant's breaches of contract are actionable.

### Damages

■ As I mentioned earlier, the present determination merely runs to a declaration of liability. Plaintiffs have not shown, nor are they required to show at this juncture, the exact quantum and elements of damages. In fact, until the tax liabilities are finally determined by the proper authorities, calculations with respect to the largest element of damages, *i.e.*, Mayers' deficiency assessment, are impossible and an award would be entirely speculative. *See* n. 20 *supra.* This difficulty does not foreclose, however, a determination of the availability of punitive damages against DCA for its breaches of contract.

The legal standards to be applied in determining whether an award of punitive damages against DCA for these breaches were set forth in some detail in my summary judgment opinion. Slip Op. at 32 to 34. At that time, I wrote:

> Ordinarily, punitive damages have not been recoverable in an action for breach of contract. *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 449 [358 A.2d 805] (App.Div.), *cert. denied*, 71 N.J. 503 [366 A.2d 658] (1976). The fact that a breach of contract is characterized as "malicious" has not been sufficient to alter this rule.... However, certain exceptions to the rule "have been carved out ... in actions arising out of contract where the unusual relationship between the parties reflects a breach of trust beyond ... mere breach of ... contract." ... The *Sandler* court recognized that the exceptions were not exclusive, however, that the form of action was not necessarily determinative and that there could be instances "involving such an aggravated set of facts that puni-

tive damages" could be recovered despite "the contract form of the cause of action and even though . . . beyond the scope of the recognized exceptions." . . .

. . . [T]here is no *per se* prohibition against the imposition of punitive damages in contract actions. Rather, it would seem that assessment of whether the circumstances of a given case constitute a sufficiently "aggravated set of facts" to warrant imposition of punitive damages is a question properly determined after a trial on the merits.

Slip Op. at 32 to 33 (citations omitted). Thus, my inquiry at the present time is limited to a determination whether plaintiffs have proven a "sufficiently 'aggravated set of facts' to warrant imposition of punitive damages." *Id.*

Initially, I must note that plaintiffs have not pressed this issue in their post-trial briefs. Nor has the defendant addressed this point in great detail. I am convinced, however, that the plaintiffs have not established that this case presents such a set of facts. The *Sandler* court, in reversing the state trial court's award of punitive damages, explained:

The mere fact that a court has found that the weight of the evidence is balanced in favor of one side rather than the other, or that the motivation of the breaching party was to advance his own interests and financial position, does not furnish the basis for a finding of the type of wrongful, malicious conduct which could support a claim for punitive damages even if the doctrine were extended to contract actions.

Our review of the record convinces us that the litigation herein was the result of a series of bona fide disputes with each party seeking the maximum benefit for his own interest, and that the facts do not warrant a finding of the malicious wrongful conduct which is a prerequisite to an award of punitive damages.

141 N.J.Super. at 451 to 452, 358 A.2d 805. I credit the testimony of Alvin Sherman and Morris Sherman that the deductions taken by DCA were only taken in the inter-est of DCA and not with the intention of harming or ruining the Mayers. This evidence is ample support for my determination that the rationale espoused by the *Sandler* court is applicable in the present matter. Also, the decision to seek a tax benefit of several hundred thousand dollars is in and of itself strong support for my finding that punitive damages should not be awarded. I have not been presented with any credible evidence which persuades me that there existed the necessary "wrongful, malicious conduct." Henry Mayer's uncorroborated testimony concerning alleged threats of financial ruin made by Alvin Sherman do not suffice to bring the defendant's conduct within the sphere of malicious and wrongful conduct. Thus, I rule that plaintiffs are not entitled to an award of punitive damages.

### III. Declaration

On the basis of the foregoing opinion, it is the declaration of this court that the parties reached an understanding in 1969 that, regardless of any potential entitlement under the Internal Revenue Code, DCA would contractually forego its right to claim a subsequent tax deduction for imputed interest expense arising out of this transaction. DCA breached this understanding when it took such a deduction on its 1973 tax return. I also declare that DCA breached the contractual obligation contained in section 13.10 and preserved by the Releases when during 1974 and 1975 it argued in support of its imputed interest deduction for the 1973 tax-year that the DCA shares received by the Mayers were not voting shares.

These breaches are actionable since the various defenses asserted by the defendant are to a great extent without merit. The time limitation contained in section 6.2 of the Agreement is limited in its application to those actions arising under section 6.1. The obligations imposed by section 13.10 and the understanding to forego an imputed interest deduction are not rendered illegal by 26 U.S.C. § 7206(1). Furthermore, these breaches are not within the intended scope of the Releases. Finally, plaintiffs

did not themselves breach the section 13.10 obligations when they instituted prior litigation in Delaware.

Accordingly, it is the opinion of the court that DCA is required to indemnify plaintiffs for any and all damages which may be incurred by them as a result of the defendant's wrongful conduct, including but not limited to all taxes, interests and penalties which may be found due and owing by plaintiffs to the I. R. S. as a result thereof, together with any and all expenses, costs and legal fees incurred by plaintiffs in connection with the efforts of the I. R. S. to collect the alleged deficiencies. I must note, however, that plaintiffs are not entitled to recover punitive damages against DCA since they have failed to show a sufficiently aggravated set of facts which would warrant the imposition of such damages.

The court also declares that as a direct consequence of the Releases plaintiffs are foreclosed from recovering on DCA's breach of section 13.10 when DCA took an investment loss deduction on its 1975 tax return. Plaintiffs have failed to prove that the time limitation contained in the Releases was a result of material misrepresentations by the individual defendants. I also declare that the plaintiffs have failed to prove that the individual defendants engaged in conduct which was a tortious interference with the business relations between DCA and themselves.

Plaintiff shall submit an order in conformity with this opinion, with consent as to form, within 10 days from the date hereof.